UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division

HOPEMAN BROTHERS, INC.,

      Plaintiff,

v.                                 Case No.: 4:16cv187

CONTINENTAL CASUALTY COMPANY,

AND

LEXINGTON INSURANCE COMPANY,

      Defendants.

## OPINION AND ORDER

This matter is before the Court on a motion for summary judgment filed by Continental Casualty Company, ("Continental") and Lexington Insurance Company ("Lexington") (collectively "Defendants"), ECF No. 83, as well as a motion for partial summary judgment filed by Hopeman Brothers, Inc. ("Hopeman" or "Plaintiff"), ECF No. 81. For the reasons stated below, the Court **GRANTS** in part and **DENIES** in part Defendants' motion for summary judgment, ECF No. 83, and **GRANTS** in part and **DENIES** in part Plaintiff's motion for partial summary judgment, ECF No. 81. The Court reserves for later disposition the issue of whether certain asbestos-related claims fall into products/completed operations by default and the issue of whether the underlying policies have been exhausted.

1

## I. FACTUAL AND PROCEDURAL BACKGROUND[1]

This case arises out of a coverage dispute between Hopeman and its insurers regarding numerous asbestos-related claims. From the 1930s until 2003, Hopeman specialized in the engineering, manufacture, and installation of marine interiors on ocean-going vessels. During this period, maritime standards required the use of fire-containing materials. To meet these requirements, Hopeman procured and installed several kinds of asbestos-containing panels. Since 1979, Hopeman has been named in over 123,000 claims alleging personal or bodily injury from exposure to asbestos fibers contained in marine interior materials provided by Hopeman.

Beginning in 1937, Hopeman purchased primary and, starting in 1965, excess general liability insurance coverage. During the relevant period of 1971 to 1977, Hopeman maintained multi-layer insurance coverage. Hopeman's primary-layer policies were all issued by the Liberty Mutual Insurance Company ("Liberty") for $500,000 in annual coverage (totaling $3 million in primary coverage from 1971 through 1977). Hopeman also obtained additional layers of excess insurance through annual policies issued by various excess insurers, including a number of policies issued by Defendants. From 1971 to 1974, Hopeman

---

[1] The facts in this section are drawn from the statements of undisputed fact that appear in the final pretrial order, ECF No. 155, and the parties' motions for summary judgment.

2

obtained two excess policies for $5 million in annual coverage
from the Home Indemnity Company ("Home") and the Insurance
Company of North America ("INA") for a combined total of $30
million in coverage.   From 1974 to 1977, Hopeman acquired two
further excess policies of $5 million in annual coverage from
Liberty and the Aetna Casualty & Surety Company ("Aetna") for an
additional $30 million in excess coverage.   For additional
excess coverage, Hopeman maintained a "quota share" layer
including Continental, Lexington, and North Star Reinsurance
Corporation ("North Star").   This agreement provided for $10
million in combined annual limits above the $10 million
underlying excess coverage and $500,000 primary insurance
(totaling $60 million in excess coverage from 1971 to 1977).
Lexington agreed to be responsible for half of each quota share
limit ($30 million in total), Continental for 20% ($12 million)
and North Star the remaining 30% ($18 million).

As a result of numerous asbestos exposure claims, Hopeman
has faced significant liability.   These claims have in turn
triggered the policies of Plaintiff's primary and excess-layer
insurers, and Hopeman has received payments from or otherwise
resolved coverage with all of the relevant insurers covering the
1971-77 period except Defendants.

In 2003, 2005, and 2009, Hopeman settled with Liberty,
Aetna, and INA respectively.   In 2013, Hopeman settled with the

3

Insurance Commissioner of the State of New Hampshire as Liquidator of the Home. This settlement resolved Hopeman's claims against seven Home policies, and Hopeman ultimately assigned its rights under the Home policies to a third party. In all of the above-mentioned settlements, Hopeman agreed to modified pro rata allocation. See Van Epps Dep., Ex. 11 at 125:2-127:11, ECF No. 84-11.

In late 2012, Plaintiff notified the "quota share" excess insurers that the underlying 1974-77 policies were nearing exhaustion. In February 2013, Hopeman informed Defendants and the General Reinsurance Corporation ("Gen Re"), the successor to North Star, that the underlying policies had been exhausted, and requested that the "quota share" layer insurers immediately enter settlement negotiations. Soon thereafter, Hopeman began negotiations with Gen Re, resulting in a settlement on a modified pro rata basis in October 2013.

Between 2013 and December 2016, the Claro Group ("Claro"), Hopeman's agent, negotiated with Defendants' third-party administrator, Resolute Management Inc., regarding Defendants' policies. Hopeman asserts that Continental initially agreed to pay on its policies, making $355,823 in payments between December 2012 to April 2014, but that it terminated its participation in July 2014. Lexington, however, has never agreed to participate in any payments. In December 2016, the

4

parties terminated further settlement negotiations after Resolute refused Plaintiff's latest settlement demand.

Shortly thereafter, Hopeman filed a two-count complaint, alleging breach of contract and seeking a declaratory judgment regarding Defendants' alleged obligation to pay various asbestos-related claims. See generally Compl., ECF No. 1. Specifically, Hopeman alleges that Defendants are in breach of contract for failing to reimburse Hopeman for claims related to Defendants' 1974-77 policies. See id. at 8. Hopeman also demands a declaratory judgment regarding Defendants' obligations to pay an "all sums" share of amounts incurred for asbestos-related claims arising during the 1971-77 policy periods, as well as "all sums" incurred in defense of such claims. Id. at 7, 9. In May 2017, Defendants filed their answers to the complaint. ECF Nos. 32, 33.

In November 2017, Plaintiff filed its motion for partial summary judgment. ECF No. 81. Hopeman first requests summary judgment on two scope of coverage issues: (1) that the "all sums" allocation method applies to the policies, id at 1; and (2) that the Lexington Policies provide defense coverage, id. Plaintiff next seeks a ruling that the underlying insurance of the 1974-77 policies has been exhausted. Id. at 2. For the 1971-74 policies, Hopeman requests summary judgment that Hopeman's payment of the Home policy's products/completed

5

operations aggregate limit and the granting of an allowed claim
in the Home insolvency satisfy the Home policy's limits.  Id.
Plaintiff then argues that summary judgment is appropriate on
the following coverage issues: (1) that products/completed
operations coverage applies by default for asbestos-related
claims, id. at 2; (2) that "bodily injury" occurs for
products/completed operations claims from the date of first
exposure and continues thereafter, id. at 2-3; and (3) that each
individual alleging bodily injury from exposure to asbestos
constitutes a separate "occurrence" under the policies, id. at
3.  Hopeman also requests summary judgment that the non-
cumulation clauses only reduce Insurers' policy limits with
respect to the same "occurrence" or "loss" as the one for which
Hopeman seeks coverage, and only to the extent Hopeman has
recovered for that same "occurrence" or "loss" under relevant
prior insurance at the same "layer" or horizontal "tier" of
coverage.  Id. at 3.  Plaintiff further requests summary
judgment that the term "loss" in several relevant non-cumulation
clauses should be read narrowly, and that, in any case, the
first $7 million of recovery from Defendants will be unaffected
by the non-cumulation clauses because Hopeman has not previously
recovered from prior insurance in the same tier or layer as the
policies at issue.  Id.  Finally, Hopeman seeks a ruling that it
has satisfied any duty to mitigate or avoid losses for asbestos-

6

related claims. Id. Defendants responded to Hopeman's motion in late November 2017, ECF No. 98, and Plaintiff filed a reply in December 2017, ECF No. 115.

In November 2017, Defendants also filed their motion seeking summary judgment on five issues. ECF No. 83. Defendants first argue that Plaintiff had previously evinced a belief that Defendants' policies required a "pro rata" allocation method, and therefore should not be permitted to now seek "all sums" allocation. See Defs.' Summ. J. Br. 2, 12–15, ECF No. 84. Second, Defendants claim that, even if an "all sums" allocation method applies, the prior insurance/non-cumulation provisions must be enforced to limit coverage. Id. at 2, 15-20. Third, Defendants assert that they are under no obligation to pay the excess liability claims because the underlying policies are not exhausted. Id. at 2, 20-23. The claims are allegedly not exhausted because Hopeman compromised its claims with certain insurers for less than the full limits of those policies. Id. at 2. Fourth, Defendants argue that Hopeman failed to comply with its obligation to allocate claims according to whether they were "product" or "non-product" claims. Id. at 23-26. Accordingly, Defendants claim they are entitled to a ruling that this method of calculating the exhaustion of the underlying limits is incorrect as a matter of law. See id. at 26. Finally, Defendants claim that Hopeman is

improperly seeking reimbursement of some defense costs. See id. at 26-30.   In November 2017, Hopeman filed a response to Defendants' motion, ECF No. 97, and in December 2017, Defendants filed a reply brief,  ECF No. 113.

Having been fully briefed and considered by this Court, Plaintiff's motion for partial summary judgment and Defendants' motion for summary judgment are ripe for review.

## II. CHOICE OF LAW

Because the parties ask this Court to interpret the relevant insurance contracts, the Court must first determine which state's laws govern their interpretation.   As a federal court exercising diversity jurisdiction, the Court must apply the choice of law rules of the state in which it sits.   See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941); see also Resource Bankshares Corp. v. St. Paul Mercury Ins. Co, 407 F.3d 631, 635 (4th Cir. 2004).   In Virginia, "[q]uestions concerning the validity, effect, and interpretation of a contract are resolved according to the law of the state where the contract was made." Seabulk Offshore, Ltd. v. Am. Home Assur. Co., 377 F.3d 408, 419 (4th Cir. 2004).   A contract to provide insurance is "made" where it is "written and delivered."   Buchanan v. Doe, 431 S.E.2d 289, 291 (Va. 1993) (internal citation omitted).

Both parties admit that New York law applies in this case.

See Pl.'s Partial Summ. J. Br. at 7, 8; Defs.' Summ. J. Br. 10-12, ECF No. 84.  At the time the policies were issued, Hopeman's headquarters was located in New York.  See Defs.' Summ. J. Br. 12.  Hopeman's New York business address is listed on the policies, and it paid insurance premiums from that state.  Id. Further, Hopeman used brokers located in New York to procure the policies, and it corresponded with these brokers from New York. Id.  Under Virginia's choice of law rules, these facts establish that the policies were written and delivered in New York, and therefore New York law governs their interpretation.

### III. DECLARATORY JUDGMENT STANDARD

The Federal Declaratory Judgment Act provides that, "[i]n a case of actual controversy within its jurisdiction," the district court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201.  A district court has "unique and substantial discretion in deciding whether to declare the rights of litigants."  Wilton v. Seven Falls Co., 515 U.S. 277, 286 (1996).

Our Court of Appeals has held that a district court's discretion is not without limits and that it "may not refuse to entertain a declaratory judgment action out of whim or personal disinclination . . . but may do so only for good cause."  Nautilus Ins. Co. v. Winchester Homes, Inc., 15 F.3d 371, 375

(4th Cir. 1994) (internal quotation marks and citations omitted). In determining whether to issue a declaratory judgment, a district court should consider (1) whether such judgment "will serve a useful purpose in clarifying and settling the legal relations in issue," and (2) whether it "will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." Centennial Life Ins. Co. v. Poston, 88 F.3d 255, 256 (4th Cir. 1996) (internal quotation marks and citation omitted); see also 10B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2759 (4th ed. 2013 and Supp. 2017) [hereinafter Wright & Miller]. While "a declaration of parties' rights under an insurance policy is an appropriate use of the declaratory judgment mechanism," United Capitol Ins. Co. v. Kapiloff, 155 F.3d 488, 494 (4th Cir. 1998), declaratory judgment is not warranted where it is used "to try a controversy by piecemeal, or to try particular issues without settling the entire controversy[.]" Centennial, 88 F.3d at 256; see also 10B Wright & Miller at § 2759.

The controversy at hand appears well suited for a declaratory judgment. Plaintiff seeks declaratory judgment regarding numerous issues related to the scope of Defendants' 1971-74 coverage obligations. See Compl. ¶¶ 33-37. These issues are nearly identical to those of the breach-of-contract

claim of the 1974-77 policies, and a declaration of rights under the non-triggered policies will obviate the need for further litigation construing such policies. While Defendants deny that Plaintiff's demanded relief is justified, they agree that a genuine dispute exists regarding these policies. <u>See</u> Lexington's Answer ¶ 35, ECF No. 32; Continental's Answer ¶ 35, ECF No. 33. There are also no parallel state proceedings underway that would threaten piecemeal resolution of this matter. Thus, the Court finds that a declaratory judgment regarding the Defendants' 1971-74 policies is warranted.

## IV. SUMMARY JUDGMENT STANDARD OF REVIEW

The Federal Rules of Civil Procedure provide that a district court shall grant summary judgment in favor of a movant if such party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The mere existence of some <u>alleged</u> factual dispute between the parties "will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Anderson v. Liberty Lobby Inc.</u>, 477 U.S. 242, 247-48 (1986) (defining "genuine" dispute as "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party"). Furthermore, the standard at summary judgment requires

11

that the evidence be viewed in favor of the nonmovant and that all "justifiable inferences" be drawn in his favor. Anderson, 477 U.S. at 255.

Moreover, because a ruling on summary judgment "necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits[,]" where the preponderance of the evidence standard applies, "[t]he mere existence of a scintilla of evidence in support of the [non-movant]'s position will be insufficient" to overcome a movant's well-founded summary judgment motion. Anderson, 477 U.S. at 252. If a movant has properly advanced evidence supporting entry of summary judgment, the nonmoving party may not rest upon the mere allegations of the pleadings, but instead must set forth specific facts in the form of exhibits and sworn statements illustrating a genuine issue for trial.[2] Celotex Corp. v. Catrett, 477 U.S. 317, 322–24 (1986). At that point, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. In doing so, the judge must construe the facts and all "justifiable inferences" in the light most favorable to the non-moving party,

---

[2] "When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must — by affidavits or as otherwise provided in this rule — set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).

and, further, the judge may not make credibility determinations. Id. at 255; T-Mobile Northeast LLC v. City Council of City of Newport News, Va., 674 F.3d 380, 385 (4th Cir. 2012). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." Anderson, 477 U.S. at 255.

New York law controls the substantive aspects of this diversity case, Erie Railroad v. Tompkins, 304 U.S. 64 (1938), but federal law controls the procedural aspects. Hanna v. Plumer, 380 U.S. 460 (1965).

Under New York law, courts interpret insurance policies according to general rules of contract interpretation. Olin Corp. v. Am. Home Assur. Co., 704 F.3d 89, 98 (2d Cir. 2012) [hereinafter "Olin III"]. New York courts seek "to give effect to the intent of the parties as expressed in the clear language of the contract." Ment Bros. Iron Works Co. v. Interstate Fire & Cas. Co., 702 F.3d 118, 122 (2d Cir. 2012). "Terms in an insurance contract must be given 'their plain and ordinary meaning.'" Id. (quoting 10 Ellicott Square Court Corp. v. Mountain Valley Indem. Co., 634 F.3d 112, 119 (2d Cir. 2010)). Summary judgment regarding the meaning of an insurance policy is warranted when the terms of a policy are unambiguous. Seiden

13

Assocs., Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992).

"The determination of whether an insurance policy is ambiguous is a matter of law for the court to decide." Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp., 595 F.3d 458, 465-66 (2d Cir. 2010) (collecting cases). A contractual term is ambiguous if it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." Nowak v. Ironworkers Local 6 Pension Fund, 81 F.3d 1182, 1192 (2d Cir. 1996) (citation omitted). Contractual language is unambiguous where it provides "a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." Olin III, 704 F.3d at 99 (quoting Hunt Ltd. v. Lifschultz Fast Freight, Inc., 889 F.2d 1274, 1277 (2d Cir. 1989)).

When a contractual provision is ambiguous, a court may consider extrinsic evidence to ascertain the parties' intent at the formation of the contract. JA Apparel Corp. v. Abboud, 568 F.3d 390, 397 (2d Cir. 2009). "Where there is such extrinsic evidence, the meaning of the ambiguous contract is a question of

14

fact for the factfinder." Id. If extrinsic evidence fails to establish the parties' intent, the issue of the meaning of the ambiguous contract remains a question of law for the court. State v. Home Indem. Co., 486 N.E.2d 827, 829 (N.Y. 1985). Courts may then apply other rules of contract interpretation, including New York's rule of *contra proferentem,* according to which ambiguity should be resolved in favor of the insured. Olin III, 704 F.3d at 99.

## V. DISCUSSION

### A. Whether "All Sums" or "Pro Rata" Allocation Applies

The parties have cross-moved for summary judgment regarding the proper allocation method to apply to the policies, with Hopeman seeking an "all sums"[3] method and Defendants seeking a "pro rata"[4] method. Pl.'s Partial Summ. J. Mot. 1, ECF No. 81; Defs.' Summ. J. Br. 12-15, ECF No. 84. Hopeman claims that the New York Court of Appeals held in In re Viking Pump, Inc., 27 N.Y.3d 244 (N.Y. 2016) [hereinafter Viking Pump (NY)], that an

---

[3] An "all sums" method of allocation for insurance coverage is the equivalent of seeking "joint and several" liability. This allocation theory "permits the insured to 'collect its total liability . . . under any policy in effect during' the periods that the damage occurred,' up to the policy limits." In re Viking Pump, Inc., 27 N.Y.3d 244, 255 (N.Y. 2016) (quoting Roman Catholic Diocese of Brooklyn v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 21 N.Y.3d 139, 154 (N.Y. 2013)). "The burden is then on the insurer against whom the insured recovers to seek contribution from the insurers that issued the other triggered policies." Viking Pump, 27 N.Y.3d at 255-56.

[4] "Under a [pro rata] method, an insurer's liability is limited to sums incurred by the insured during the policy period; in other words, each insurance policy is allocated a pro rata share of the total loss representing the portion of the loss that occurred during the policy period." Viking Pump (NY), 27 N.Y.3d at 256.

"all sums" allocation method must apply to policies containing non-cumulation clauses ("NCCs") like those in the instant policies. Pl.'s Partial Summ. J. Br. 9, ECF No. 82. Defendants deny that Viking Pump (NY) necessarily held that all sums allocation is required for all policies including such NCCs. Defs.' Opp'n Partial Summ. J. Br. 10, ECF No. 98; Defs.' Summ. J. Br. 13. They note that before Viking Pump (NY), "pro rata" allocation was the preferred method for such cases, and they assert that pro rata "remains a touchstone of New York law." Defs.' Opp'n Partial Summ. J. Br. 10. Further, Defendants claim that, to invoke an all sums allocation method, Hopeman must first establish that there is a loss which is covered in whole or in part under any other excess policy issued to Hopeman before the inception date of the policy. Id. at 12. They assert that Hopeman has failed to make such a showing, and therefore summary judgment is, at best, premature. Id.

Defendants also claim that, even if all sums allocation is otherwise required, Plaintiff should be held to a pro rata method because Hopeman's prior course of conduct evinced a belief that the policies required this method. See Defs.' Summ. J. Br. 2, 12-15; Defs.' Opp'n Partial Summ. J. Br. 11-12. Hopeman settled with its other insurers on a modified pro rata basis, billed those insurers on a modified pro rata basis, and claims to have billed Lexington and Continental on a modified

16

pro rata basis.   Defs.' Summ. J. Br. 15.   Defendants conclude
that Hopeman should be held, not to the modified pro rata
method, but instead to "a time on the risk pro rata allocation
method." Defs.' Opp'n Partial Summ. J. Br. 12.

Before turning to Defendants' other allocation method
arguments, the Court will first determine whether, under New
York law, the contractual language of the instant policies
requires an "all sums" or "pro rata" method of allocation.
Because this Court is bound by the Viking Pump (NY) court's
interpretation of non-cumulation clauses, the Court will briefly
summarize below the relevant points from that case.

### 1. The Viking Pump (NY) Decision and Allocation

The appeal in Viking Pump (NY) arose from an insurance
coverage dispute between two companies and their excess policy
insurers regarding numerous asbestos exposure claims.   In that
case, the Delaware Supreme Court certified two questions to the
New York Court of Appeals, one of which was "whether 'all sums'
or 'pro rata' allocation applies where the excess insurance
policies either follow form to a non-cumulation provision or
contain a non-cumulation and prior insurance provision[.]"
Viking Pump (NY), 27 N.Y.3d at 250.

In addressing this question, the Viking Pump (NY) court
began by restating its general approach to interpreting
insurance contracts.   They explained, "we emphasized in

17

*Consolidated Edison*, and have reiterated thereafter, that 'in determining a dispute over insurance coverage, courts first look to the language of the policy.'" Viking Pump (NY) at 257 (quoting Roman Catholic Diocese of Brooklyn v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 21 N.Y.3d 139, 148 (N.Y. 2013)). They noted that, while they had previously found that a pro rata allocation method should apply in several decisions prior to Viking Pump (NY) that featured losses spanning policy years, they did not "adopt a strict rule mandating either pro rata or all sums allocation because insurance contracts, like other agreements, should be enforced as written, and parties to an insurance arrangement may generally contract as they wish and the courts will enforce their agreements without passing on the substance of them." Id. at 250 (internal quotation marks and citation omitted). They then reiterated that the allocation issue should be resolved by applying established principles of contract interpretation under New York law. Id.

Applying those principles to the language of the contracts before them, the Viking Pump (NY) court determined that an all sums approach applied for "long-tail" claims.[5]   Of particular

---

[5] Long-tail claims are those where exposure to an injury-inducing harm, such as asbestos or an environmental contaminant, typically spans multiple policy periods. See Viking Pump (NY), 272 N.Y.3d at 255.   Long-tail claims frequently spawn litigation like that of the instant case "over which policies are triggered in the first instance, [and] how liability should be allocated among triggered policies and the respective insurers, and at what point insureds may turn to excess insurance for coverage." Id.

note, the court found that the NCCs' language — which stated
that the provision applied if "the same occurrence gives rise to
. . . injury or damage which occurs partly before and partly
within any annual period" — contemplated "that multiple
successive insurance policies can indemnify the insured for the
same loss or occurrence." Id. at 261.  The court concluded that
this was inconsistent with a pro rata approach.  Id. at 261.
The court further noted that applying the pro rata allocation
method to a contract containing a non-cumulation clause would
render such clause a surplusage — "a construction that cannot be
countenanced under [New York] principles of contract
interpretation." Id.

## 2. Applying Viking Pump (NY) to the Instant Policies

The policies at issue all contain or follow form to NCCs
identical to those construed in Viking Pump (NY).  Looking first
to the 1974—77 Continental policy, it follows form to the same
Liberty Mutual NCC at issue in Viking Pump (NY).  Compare Viking
Pump (NY), 27 N.Y.3d at 252 (noting the language of the Liberty
Mutual umbrella policy's NCC), with Ex. G at 90, ECF No. 1-7.
The 1971-74 and 1974-77 Lexington policies and the 1971-74
Continental policy all each contain the provision that the New
York Court of Appeals referred to as "Condition C." Compare
Viking Pump (NY), 27 N.Y.3d at 252, with Ex. C at 41, ECF No. 1-

3, and Ex. D at 55, ECF No. 1-4, and Ex. E at 65, ECF No. 1-5. The Viking Pump (NY) court found that the Liberty NCC and the Condition C provisions require an all sums allocation method with respect to long-tail claims.   27 N.Y.3d at 264.   For this Court to reach a different conclusion regarding these NCCs, Defendants would have to point to some additional policy language or provisions that would indicate that the NCCs have a different meaning than those in Viking Pump (NY).   Defendants have failed to make such a showing, and therefore this Court is precluded from interpreting the NCCs differently from the New York Court of Appeals.

With respect to Defendants' argument that, even if the policies might otherwise require all sums allocation, a ruling that such method applies would be premature before Hopeman identifies a loss or occurrence covered under each policy that is also covered under any other excess policy, the Court finds that this goes beyond what is necessary under Viking Pump (NY). The Viking Pump (NY) court determined on the basis of the NCC language alone that "all sums allocation is appropriate in policies containing such provisions."   27 N.Y.3d at 264. Defendants have pointed to nothing in Viking Pump (NY) or any other subsequent case that demonstrates that a policyholder must show the existence of at least one long-tail claim before receiving a ruling on allocation method.   Because the plain

language of the NCCs reveals the parties' intent to use an all sums allocation, Plaintiff need not also demonstrate that there is a specific claim for each policy to receive a ruling that all sums allocation applies to the relevant long-tail claims arising under each policy.

Therefore, this Court finds, as a matter of New York contract law, that the NCCs' contractual language unambiguously requires an all sums allocation method for long-tail claims.

### 3. Whether Hopeman Should Be Bound to a Pro Rata Method

Defendants also claim that, regardless of whether the policies otherwise require all sums allocation, Hopeman should be held to a pro rata method based on its prior course of conduct. The precise theory upon which Defendants rely for this proposition is unclear.

Defendants cite several cases in which courts found that a party's prior course of conduct was relevant for establishing a "practical construction" of an ambiguous contract, see Defs.' Summ. J. Br. 13-14, ECF No. 84, but Defendants explicitly deny offering a practical construction argument, see Defs.' Summ. J. Reply Br. 8, ECF No. 110. They also fail to respond to the following arguments offered by Plaintiff: (1) practical construction does not apply because the prior course of conduct was with parties other than Defendants; (2) practical construction only applies where a provision is ambiguous, and

21

Defendants have not argued that the NCC is ambiguous; (3) Defendants cannot establish the requisite knowledge or acquiescence, because the prior conduct cannot be shown to be an interpretation of the policy language and New York law, rather than a reasonable resolution of disputed issues; and (4) in any case, Hopeman would only be bound to a modified pro rata method, because that is all it has agreed to with its insurers. See Pl.'s Partial Summ. J. Br. 9-11, ECF No. 82. Based on Defendants' denial that they are offering a practical construction argument and their failure to rebut Plaintiff's arguments, the Court views any practical construction argument to have been waived.

Plaintiff also points out, and Defendants do not deny, that the insurers are not arguing that Hopeman is collaterally estopped. See Pl.'s Opp'n Summ. J. Br. 10, ECF No. 97. In the absence of a practical construction or collateral estoppel theory, the Court construes Defendants' argument to be that, for reasons of fair dealing, Plaintiff should not be able to offer a position that is inconsistent with the one it has taken in settlement negotiations. This argument would be similar to that of judicial estoppel, where a party may be precluded as a matter of law from offering a position in conflict with one earlier taken in the same or related litigation. See King v. Herbert J. Thomas Mem'l Hosp., 159 F.3d 192, 196 (4th Cir. 1998). While

the precise contours of judicial estoppel have not been clearly defined, one inquiry courts make in determining whether to preclude an inconsistent position is whether there is a reasonable explanation for a party's inconsistent positions. See 18B Wright & Miller § 4477.

Construing Defendants' argument in this way, the Court finds Plaintiff's explanation, for why it has previously used a modified pro rata basis, to be reasonable. Hopeman notes that pro rata allocation was part of the terms of the Wellington Agreement that it entered in 1985 as part of an effort to resolve uncertainties as to how signatories' insurance would apply to asbestos claims. See Pl.'s Opp'n Summ. J. Br. at 10, ECF No. 97. Several of Hopeman's paying insurers are Wellington signatories, and Hopeman's other insurers who are not Wellington signatories have been willing to accept the benefits of the modified pro rata approach rather than seeking to litigate their obligations. See id. Hopeman also points out that it has offered Defendants a settlement based on the modified pro rata approach, but that Defendants have refused this offer. Id. at 10-11. Based on these facts, it appears that Plaintiff has a reasonable explanation for why it has previously used a modified pro rata allocation method, and it thus does not appear that Plaintiff should be precluded from seeking an all sums allocation method.

### 4. Whether Hopeman Has "Opted Out" of an All Sums Allocation by Settling with Other Insurers on a Pro Rata Basis

Defendants also claim that Hopeman should be bound to a pro rata allocation method because "by settling with other insurers on a pro rata basis and exhausting the underlying limits horizontally, Hopeman has opted out of an all sums allocation," Defs.' Summ. J. Reply Br. at 8, ECF No. 110.

The single case the Defendants cite in support of this claim, GenCorp, Inc. v. AIU Ins. Co, 297 F. Supp. 2d 995 (N.D. Ohio 2003) is of dubious value. See Defs.' Summ. J. Reply Br. at 8. In GenCorp, the court found that the plaintiff's decision to settle with its primary insurers on a pro rata basis meant that it had elected to allocate liability "as broadly as possible among all primary policies in effect during that period." 297 F. Supp. 2d at 1008. Because settlement with the primary insurers eliminated each of the excess carriers' right to seek contribution from the primary insurers, the court declined to permit the policyholder to seek an all sums method allocation for the excess insurers, finding that this "would be contrary to the settlements reached." Id.

While the Sixth Circuit affirmed the reasoning of the district court in an unpublished decision, GenCorp Inc. v. AIU Insurance Co., 138 F. App'x 732 (6th Cir. 2005), the extent to which GenCorp is consistent even with Ohio law is disputed. An

24

Ohio appellate court rejected GenCorp's reasoning in a decision in 2008, see B.F. Goodrich Co. v. Commercial Union Ins. Co., Nos. 23585, 23586, 2008 WL 2581579 (Ohio Ct. App. June 30, 2008), but later an Ohio trial court applied GenCorp in holding that a policyholder could not use an all sums allocation method with excess insurers where it had elected to follow a modified pro rata method when settling with primary insurers, see MW Custom Papers LLC v. Allstate Ins. Co., Montgomery C.P. No. 2012 CV 03228, 2012 WL 6565832, (Sept. 21, 2012). In 2013, the Supreme Court of Ohio accepted a certified question to resolve whether GenCorp accurately reflected Ohio law, but the case settled before the court issued an opinion. See Lincoln Elec. Co. v. Travelers Cas. & Sur. Co., No. 2013-1088, 994 N.E.2d 461 (Ohio Sep. 25, 2013); see also 12/25/2014 Case Announcements, 21 N.E.3d 1114 (Ohio Dec. 25, 2014) (dismissing the case at the parties' request). Cases subsequent to Lincoln Electric have not demonstrated whether GenCorp is accepted as Ohio law.

To the Court's knowledge, every court outside of Ohio that has been asked to adopt GenCorp's holding has found its reasoning to be flawed and its approach to be inconsistent with "all sums" allocation. See Westport Ins. Corp. v. Appleton Papers Inc., 787 N.W.2d 894, ¶¶ 31, 76 (Wis. Ct. App. 2010) (stating it did "not find [the GenCorp] case useful" and affirming the trial court's conclusion that the policyholder's

"prior settlements of insurance policies in various years ha[d] no bearing on [its] right now to select triggered policies on a vertical, by-year basis"); Dana Cos., LLC v. Am. Emps. Ins. Co., No. 49D14-1012-PL-053501, slip op. at ¶ 39 (Ind. Super. Ct. May 8, 2013) ("[GenCorp] did not explain how its result could be harmonized with the 'all sums' authorities like Goodyear or DanaIII. GenCorp, at best, is an outlier opinion that wrongly interprets the meaning of Ohio's 'all sums' scope of coverage. To the extent GenCorp is inconsistent with that settled meaning, this Court holds that it misstates Ohio law and is of no persuasive value as to the law in Indiana."); Massachusetts Elec. Co. v. Commercial Union Ins. Co., No. 99-00467B, 2005 WL 3489874, *2 (Mass. Super. Oct. 25, 2005) (noting that GenCorp is inconsistent with "all sums" allocation). In light of the many reasons offered in the above cases regarding the flaws in the GenCorp opinion, and because it is unclear whether it even is consistent with Ohio law, this Court declines to find that GenCorp is persuasive authority regarding New York law.

Therefore, because Defendants have not successfully asserted any theory under which Plaintiff's prior course of conduct should bind it in this litigation, the Court concludes that Plaintiff may seek an all sums approach for the instant policies.

### 5. Whether Hopeman Must Allege a Single "Loss" or "Occurrence" To Obtain All Sums Allocation

Defendants' final argument against granting summary judgment for an all sums allocation is that Plaintiff has failed to allege that the claims for which it seeks coverage all constitute the same "loss" or "occurrence," which Defendants claim is a condition precedent to the application of the clause in all contexts. Defs.' Summ. J. Br. at 16, ECF No. 84.

Plaintiff denies that any such requirement exists and argues that the relevant cases show that a finding that each asbestos-related claimant is a separate occurrence is not in tension with the all sums method. Pl.'s Opp'n Summ. J. Br. 12, ECF No. 97. First, Plaintiff notes that in Viking Pump the Delaware trial courts determined that each asbestos plaintiff's injury constituted a separate "occurrence" under New York law. Id. (quoting Viking Pump, Inc. v. Century Indem. Co., 2 A.3d 76, 110-11 (Del. Ch. 2009)); see also Viking Pump, Inc. v. Century Indem. Co, No. CV10C06141FSSCCLD, 2013 WL 7098824, at *3 (Del. Super. Ct. Oct. 31, 2013) [hereinafter "Viking Pump III"] (citing with approval the earlier Delaware trial court's finding that each asbestos plaintiff's injury was an individual occurrence under New York law). Plaintiff next notes that the Viking Pump (NY) court did not contradict the lower Delaware trial courts' rulings and made no finding establishing that the

27

claims were a single "loss" or "occurrence." Pl.'s Opp'n Summ. J. Br. 12. Plaintiff also points out that Defendants' asserted requirement is absent from cases subsequent to Viking Pump (NY) that have found that NCCs require all sums allocation. Id. (citing Olin Corp. v. OneBeacon Am. Ins. Co., 864 F.3d 130, 144 (2d Cir. 2017) [hereinafter "Olin IV"]; Liberty Mut. Ins. Co. v. Fairbanks Co., No. 13-CV-3755 (JGK), 2016 WL 4203543 (S.D.N.Y. Aug. 8, 2016)). Thus, according to Plaintiff, there is no authority supporting Defendants' asserted requirement. Id. at 12-13.

Plaintiff also argues that the plain language of the NCCs does not require that all losses or occurrences constitute a single loss, and notes that the same "loss" or "occurrence" language in the NCCs only is relevant for purposes of demonstrating a contractual intent inconsistent with pro rata allocation. Id. at 12 (quoting Viking Pump (NY), 52 N.E.3d at 1153). Plaintiff asserts that each asbestos-related claim that spans multiple policy years would qualify as an "occurrence" for which multiple successive insurance policies can indemnify the insured, and that there is no requirement based in the policy language that Hopeman must allege that all asbestos claims constitute one occurrence. Id. at 12-13.

The Court finds Plaintiff's arguments to be persuasive. Defendants have cited no legal authority for their position, and

28

the Court is not convinced that there is any tension between an all sums allocation method and a finding that each asbestos claimant constitutes a separate occurrence. The plain language of the NCCs merely contemplates that a loss can be covered by more than one period, and Defendants have pointed to no policy language supporting a requirement that all losses or occurrences must be aggregated into a single loss or occurrence before applying the NCCs. Moreover, the complete absence of this supposed requirement in either Viking Pump (NY) or other opinions applying the all sums allocation method under New York law fatally undermines Defendants' position.

In light of the plain language of the NCCs, the New York Court of Appeals' binding guidance in Viking Pump (NY), and this Court's rejection of Defendants' other arguments regarding the application of the all sums method, the Court finds that, as a matter of New York contract law, the policies are unambiguous on the allocation issue and that summary judgment is warranted. Seiden Assocs., 959 F.2d at 428. Therefore, the Court **DENIES** Defendants' request for summary judgment that a pro rata allocation method applies to the policies, ECF No. 83, and **GRANTS** Plaintiff's request for summary judgment that all sums allocation applies to the policies, ECF No. 81.

## B. Whether the Policies Require Vertical or Horizontal Exhaustion

Hopeman next requests summary judgment that the Continental and Lexington policies only require "vertical" exhaustion of directly underlying insurance. See Pl.'s Mot. Partial Summ. J. 1, ECF No. 81. Because the Viking Pump (NY) court addressed the proper method of exhaustion for policies containing NCCs, the Court will briefly summarize the relevant section of that court's decision before turning to address the parties' remaining exhaustion arguments.

### 1. The Viking Pump (NY) Decision and Exhaustion

In addition to ruling on which allocation method was required for policies containing NCCs, the Viking Pump (NY) court decided the related question of whether vertical or horizontal exhaustion applies to such policies. The Viking Pump (NY) court noted that under horizontal exhaustion, an insured is required to "exhaust all triggered primary and umbrella excess layers before tapping into any of the additional excess insurance policies." 27 N.Y.3d at 264. Under vertical exhaustion, an insured party can "access each excess policy once the immediately underlying policies' limits are depleted, even if other lower-level policies during different policy periods remain unexhausted." Id.

After looking to the policies, which all hinged their

30

attachment on the exhaustion of underlying policies that covered the same policy periods and were identified by either name, policy number, or policy limits, the court concluded that vertical exhaustion was required.  Id.  This was because "vertical exhaustion is more consistent than horizontal exhaustion with this language tying attachment of the excess policies specifically to identified policies that span the same policy period."  Id.  Furthermore, the court found that vertical exhaustion was "conceptually consistent with an all sums allocation, permitting the Insured to seek coverage through the layers of insurance available for a specific year."  Id.  Thus, as explained in Oliv IV, "the Court of Appeals held that an insured could pursue insurers whose policies contained a prior insurance provision for indemnification irrespective of whether policies covering other years over the course of the loss period potentially were triggered by the same occurrence."  Olin IV, 864 F.3d at 143.

### 2. Whether Vertical Exhaustion Applies to the Instant Policies

Hopeman argues, and Defendants do not deny, that the instant policies hinge their attachment on the exhaustion of underlying policies that cover the same policy periods and are identified by either name, policy number, or policy limits.  See Pl.'s Partial Summ. J. Br. 12, ECF No. 82.  Plaintiff notes that the Continental policies state that Continental pays a "20%

quota share or $2,000,000 each occurrence combined Single limit Bodily Injury and Property Damage and $2,000,000 annual aggregate part of $10,000,000 umbrella/layer excess of $10,000,000 lower layer umbrella which is in turn excess of primary insurance as scheduled in Endorsement #1 attached." Id. (quoting Johnson Ex. 2 at 1859, ECF No. 82-3, and Johnson Ex. 3 at 1869, ECF No. 82-4). Endorsement 1 identifies the Home Umbrella and INA policies as underlying the 1971-74 Continental policy, Johnson Ex. 2 at 1864, and the Liberty Umbrella and the Aetna policies as underlying the 1974-77 Continental policy, Johnson Ex. 3 at 1875. Endorsement 1 also identifies Liberty as the primary insurer for both periods, though it mistakenly identifies the primary aggregate limit as $300,000 rather than the $500,000 aggregate limit paid by Liberty. See Johnson Ex. 2 at 1864; Johnson Ex. 3 at 1875.

Plaintiff next notes that the Lexington policies also hinge attachment on the exhaustion of specific underlying policies. Pl.'s Partial Summ. J. Br. 13, ECF No. 82. For 1971-74, the declarations identify the underlying policies as the $5 million layer of the Home Umbrella policy and $5 million provided by "Various Companies and Policies." Johnson Ex. 4 at 1885, ECF No. 82-5. Hopeman explains that "Various Companies and Policies" is referring to the $5 million INA policy. Pl.'s Partial Summ. J. Br. 13. For the 1974-77 policy, Endorsement 1

32

states that the underlying umbrella insurers include "(a) Liberty Mutual - Various" and "(b) Aetna C & S." Johnson Ex. 5 at 1898, ECF No. 82-6.

Hopeman explains, and again Defendants do not deny, that both the policies at issue and the underlying policies are "annualized," meaning that, for example, a three-year policy issued by Continental or Lexington provides for three separate limits of liability, one for each one-year policy period. Pl.'s Partial Summ. J. Br. 13. The 1971-74 Continental policy follows form to the annualization of the INA and Home policies, which provide a limit of liability "in the aggregate for each annual period." Id. (quoting Home Policy, Johnson Ex. 8 at 1921, ECF No. 82-9) (citing INA Policy, Johnson Ex. 9 at 1934, ECF No. 82-10). The 1974-77 Continental policy follows form to the "annual period" language of the Liberty umbrella policy and "annual aggregate" language of the Aetna policy. Id. (quoting Liberty Policy, Johnson Ex. 10 at 1947, ECF No. 82-11; Aetna Policy, Johnson Ex. 11 at 1970, ECF No. 82-12). The Lexington policies each provide coverage in the aggregate for "each annual period during the currency of t[he] policy" for "Product Liability," excess of $10 million "in the aggregate for each annual period during the currency of th[e] Policy" for "Products Liability." Id. (quoting Johnson Ex. 4 at 1888, ECF No. 82-5; Johnson Ex. 5 at 1902, ECF No. 82-6). Thus, because all the policies are

33

annualized, Plaintiff claims that a policy is vertically exhausted if in any policy year the directly underlying $500,000 primary policy limit and the $10 million underlying excess limits have been satisfied.   Id.   Hopeman therefore seeks summary judgment that Defendants are liable for a combined $7 million in each year in which the underlying policies have been exhausted.   Pl.'s Mot. Partial Summ. J. 2, ECF No. 81.

While Defendants strongly contest whether the underlying policies have been exhausted, they do not attempt to refute Plaintiff's contention that vertical exhaustion applies to the policies.   See Defs.' Opp'n Partial Summ. J. Br. 10-12, ECF No. 98 (noting that Plaintiff had previously used a horizontal exhaustion method when using a modified pro-rata allocation method, but failing to argue that the instant policies require horizontal exhaustion).   In addition, Defendants admit that the policies are annualized in the way Plaintiff suggests.   See id. at 1.   The Court is also satisfied that the NCCs are unambiguous and that vertical exhaustion applies to the policies.   As in Viking Pump (NY), the instant policies hinge attachment on the exhaustion of specific underlying policies.   27 N.Y.3d at 264. The Court has also found that an all sums allocation method applies to the policies, and the Viking Pump (NY) court stated that vertical exhaustion is more appropriate than horizontal exhaustion in such circumstances.   Id.

In light of the above, the Court finds that the contractual language in the NCCs is unambiguous and summary judgment regarding the vertical exhaustion issue is warranted. <u>Seiden Assocs.</u>, 959 F.2d at 428. Therefore, the Court **GRANTS** summary judgment in favor of Plaintiff on this issue, finding that vertical exhaustion applies to the instant policies and that Hopeman may obtain coverage from the Insurers up to a combined $7 million in each policy year where any directly underlying $500,000 primary policy limit and $10 million underlying excess limit has been satisfied. ECF No. 81.

## C. Whether the Non-Cumulation Clauses Reduce the Limits of Defendants' Policies

The parties next dispute the extent to which the NCCs should reduce the instant policies' limits. <u>See</u> Pl.'s Mot. Partial Summ. J. 3, ECF No. 81; Defs.' Summ. J. Br. 15-20, ECF No. 84.

The New York Court of Appeals explained in <u>Viking Pump (NY)</u> that the purpose of non-cumulation clauses is to "prevent stacking, the situation in which 'an insured who has suffered a long term or continuous loss which has triggered coverage across more than one policy period . . . wishes to add together the maximum limits of all consecutive policies that have been in place during the period of loss.'" <u>Id.</u>, 27 N.Y.3d at 259 (quoting 12 <u>Couch on Insurance</u> 3d § 169:5). In general, New

York courts apply non-cumulation clauses in accordance with the plain meaning of their terms. 1 Dunham, New Appleman New York Insurance Law § 15.04 (2d ed. 2017) (citing Greenidge v. Allstate Ins. Co., 312 F. Supp. 2d 430, 434 (S.D.N.Y. 2004), aff'd, 446 F.3d 356 (2d Cir. 2006); Bahar v. Allstate Ins. Co., No. 01 CIV. 8129 (RCC), 2004 WL 1782552, at *4 (S.D.N.Y. Aug. 9, 2004), aff'd, 159 F. App'x 311 (2d Cir. 2005); Endicott Johnson Corp. v. Liberty Mut. Ins. Co., 928 F. Supp. 176, 182 (N.D.N.Y. 1996); Hiraldo v. Allstate Ins. Co., 840 N.E.2d 563, 564-65 (N.Y. 2005)).

## 1. Whether Non-Cumulation Clauses Only Apply to Actual Payment by Prior Policies in the Same Coverage Tier

Hopeman asserts that NCCs only apply to an attempt to recover in multiple policy periods within the same coverage "layer" or "tier." Pl.'s Partial Summ. J. Br. 28, ECF No. 82. Plaintiff claims that, as of the date on which damages were calculated, Hopeman had not assigned claims to any prior insurance above the $10.5 million attachment point of the instant policies. Id. at 7, 28. Because no prior insurer in the same coverage tier has made any payments, Hopeman argues that the NCCs have no application for at least the first policy period implicated by Hopeman's damages claim. Id. at 28. This means, at most, the Insurers can argue only that the payment of $7 million within limits will eliminate their remaining $35

million in limits without further payment. Id.

In addition, Hopeman argues that NCCs do not apply where the insured could recover under a prior insurance in the same tier but has not yet obtained recovery. Id. Because Hopeman asserts that it has not yet assigned any claims to prior policies of the same tier as the instant policies, Plaintiff claims that there has been no actual payment that would permit application of the NCCs. Id. at 28-29.

The Court finds Hopeman's above arguments to be persuasive in light of the Second Circuit's decision in Olin IV. In that case, the Second Circuit applied New York law to interpret a policy containing an NCC and found that "after *Viking Pump [NY]* it is clear that the critical factor is whether the loss covered by a policy dictating all sums is also covered by another policy in the same coverage layer, which itself has already provided indemnification to the insured for the loss." Id., 864 F.3d at 149 (emphasis added). In support of its ruling, the court cited the rationale for these rules that it had articulated in Olin III. See id. The Olin III court reasoned that, because the "intent of purchasing [higher-level] insurance . . . is to be indemnified only when lower-level policies are unable to fully indemnify a particular loss and the total damages reach that higher-level policy's attachment point", it would be unreasonable to allow the payments of the lower-level insurer to

count against the higher-level policy.  704 F.3d at 104.

The Olin IV court also noted, with respect to actual payment, that "we reject out-of-hand OneBeacon's argument that since Olin could recover from prior insurers whose policies provide coverage for loss at these sites and who sit in the same layer of coverage as OneBeacon, Olin may not recover under the OneBeacon policies."  864 F.3d at 150.  The court reached this conclusion because "[t]he prior insurance provision works in conjunction with the overarching approach dictated by Condition C to prevent the insured from stacking policies once it has already obtained indemnification for that specific loss from another policy in the relevant coverage layer."  Id.

In the Court's view, Olin IV establishes that, when applying New York law, NCCs only apply to actual payments made under prior policies at the same tier of coverage.  Defendants' response on this issue, claiming that the passages cited above from Olin IV were an "unjustified gloss," Defs.' Opp'n Partial Summ. J. Br. at 15, is not persuasive because Defendants fail to provide any analysis for such assertion, and Olin IV is clear on this point.  The above-cited passages were key to the court's ultimate ruling on the non-cumulation clause issue, and thus are a part of the case's core holding.

Therefore, the Court finds that, as a matter of New York contract law, the NCCs have an unambiguous meaning on this issue

and that summary judgment concerning them is warranted. Seiden Assocs., 959 F.2d at 428. The Court **GRANTS** summary judgment to Plaintiff, finding that the NCCs only reduce Defendants' policy limits to the extent that Hopeman has already recovered for the same "occurrence" or same "loss" under relevant prior insurance at the same "layer" or horizontal "tier" of coverage. ECF No. 81.

While Defendants contend that Plaintiff has not sufficiently offered admissible evidence to support its claim that it has not previously recovered from prior insurance in the same tier as Defendants' policies, see Defs.' Opp'n Partial Summ. J. Br. 8, the Court disagrees. Plaintiff originally cited Van Epps Declaration ¶ 17 and Van Epps Exhibit 1 in support of its position. Pl.'s Partial Summ. J. Br. 7, ECF No. 82. While the Court struck Van Epps Exhibit 1 because it found that Hopeman had blocked discovery relating to "allocation," the Court denied Defendants' motion to strike Van Epps Declaration ¶ 17. See Omnibus Order at 12, 18, ECF No. 180. Other than claiming that Plaintiff had not supported its claim with admissible evidence, Defendants have not offered any additional evidence or arguments that would raise any doubt about the evidence Hopeman has provided showing that it has not received prior payments for policies in the same tier as the instant policies. The Court therefore finds that the evidence before it

does not raise a genuine issue of material fact regarding this issue, and **GRANTS** Hopeman's request for summary judgment, finding that the first $7 million of Hopeman's damages claim cannot be subject to an NCC defense because Plaintiff has not previously recovered from prior insurance at the same tier as Defendants' policies.  ECF No. 81.

## 2. Whether the 1974-77 Continental Policy's Non-Cumulation Clause Limits Recovery

Hopeman next requests summary judgment regarding the 1974-77 Continental Policy. Pl.'s Partial Summ. J. Br. 21, ECF No. 82.  Hopeman asserts that under New York law each individual alleging bodily injury from exposure to asbestos-containing material presents a separate "occurrence" for purposes of the Continental policy.  Id.  Defendants concede that the 1974-77 Continental policy's NCC limits its effect to the same occurrence and amounts previously paid by the same company, but note that "as Hopeman recognizes, the grouping language in its policies may serve to limit its recovery under the [1974-77 Continental policy]".  Defs.' Opp'n Partial Summ. J. Br. 15, ECF No. 98.

Hopeman argues that the grouping language in the instant policies leads to the conclusion that each asbestos-related claim is a "separate occurrence" for purposes of the NCCs. Pl.'s Partial Summ. J. Br. 22-25, ECF No. 81.  With regard to

40

the 1974-77 Continental policy, Hopeman notes that it incorporates language from the Liberty Umbrella policy stating that "[f]or the purpose of determining the limits of the company's liability: (1) all **personal injury** . . . arising out of continuous or repeated exposure to substantially the same general conditions . . . shall be considered as the result of one and the same **occurrence**." Id. at 22, (quoting Johnson Ex. 10 at 1947, ECF No. 82-11) (emphasis in original). Hopeman then explains that, in light of Appalachian Insurance Co. v. General Electric Co., 863 N.E.2d 994, 999 (N.Y. 2007), the language of these policies leads back to the "unfortunate event" test articulated in Arthur A. Johnson Corp. v. Indemnity Insurance Co. of North America, 164 N.E.2d 704, 708 (N.Y. 1959). Pl.'s Partial Summ. J. Br. 22. Plaintiff further claims that, because the injuries in the instant case involved multiple claimants at multiple locations over multiple years, each featuring varied and unique exposure patterns, that these claims constitute separate occurrences under the "unfortunate event" test, and therefore should not be aggregated. Id. at 23-24.

Defendants have not responded to any of Plaintiff's arguments about the import of the grouping language. Therefore, the Court considers Defendants to have conceded Plaintiff's argument that the grouping language does not require the aggregation of claims in this case.

41

Defendants' only remaining argument regarding the 1974-77 Continental policy's NCC is vague and purportedly based on Fairbanks, 2016 WL 4203543. Defendants claim that Fairbanks, which featured the same NCC that is incorporated into the 1974-77 Continental policy, demonstrates the "appropriateness of insurer's argument that they were entitled to a reduction of limits." Defs.' Summ. J. Br. 18, ECF No. 84. In Fairbanks, Liberty requested summary judgment concerning an NCC, arguing that it should limit any recovery. 2016 WL 4203543, at *2. The court, however, found that summary judgment was not appropriate because Liberty had not taken a position on whether all asbestos claims constituted one or multiple occurrences. Id. at *4. Because the NCC at issue limited its effect to payments made for the "same occurrence," the court found that it was necessary to determine how many occurrences the asbestos claims constituted before determining how to apply the NCC. Id. The Fairbanks court neither ruled that all asbestos claims constituted a single occurrence nor that other language in the policy required grouping that would limit recovery, though it did state generally that "non-cumulation clauses must be enforced under Viking Pump [NY][.]" Id. at *5. Based on this reading of Fairbanks, the Court is unaware of how this case supports Continental's position as to how the NCC should be applied here, and Continental has not explained the significance of Fairbanks

42

beyond its conclusory statement quoted above. Thus, the Court rejects Defendants' contention that <u>Fairbanks</u> has any applicability for construing the 1974-77 Continental policy's NCC.

In light of the above, the Court finds that, as a matter of New York contract law, the language of the 1974-77 Continental policy's NCC has an unambiguous meaning and that summary judgment concerning it is warranted. <u>Seiden Assocs.</u>, 959 F.2d at 428. Therefore, the Court **GRANTS** summary judgment to Plaintiff on this issue, finding that the NCC in the 1974-77 Continental Policy limits its application to recoveries involving the same "occurrence," and that each individual alleging bodily injury from exposure to Hopeman asbestos-containing material presents a separate "occurrence." ECF No. 81.

### 3. Whether Plaintiff Must Exhaust All Triggered Policies in Chronological Order

Defendants also argue that Hopeman should not be permitted to make an "end run" around the NCCs by failing to follow an exhaustion model of applying losses to the earliest triggered policy year. Defs.' Opp'n Partial Summ. J. 14, ECF No. 98. As the Court understands Defendants' argument, they claim that Plaintiff's settlements with its lower-layer insurers on a modified pro-rata basis have unfairly prevented the policies of

43

insurers in the same coverage tier as Defendants from having to make payments in the years prior to the instant policies. See id.   If Hopeman had instead followed an all sums exhaustion model of applying losses to the first triggered policy year, then exhausting vertically through each policy year, this would in turn trigger payments by excess insurers at the same tier as Defendants, thereby permitting the application of the NCCs to limit Hopeman's recovery under the instant policies.  Id.  Based on this alleged unfairness created by Plaintiff's pro rata settlements, Defendants appear to request that the NCCs be applied counterfactually as if Hopeman had followed the all sums method described above.

The Court concludes that Viking Pump (NY) and Olin IV establish that, under an all sums allocation method, the policyholder controls the order in which triggered policies pay. The Viking Pump (NY) court explained that vertical exhaustion, which it held should be used in conjunction with all sums allocation, permits a policyholder to choose a particular triggered policy year and access an "excess policy once the immediately underlying policies' limits are depleted, even if other lower-level policies during different policy periods remain unexhausted."  27 N.Y.3d at 264.  Citing Viking Pump (NY), the Olin IV court further noted that vertical exhaustion permits an insured to "simply tap a particular tower of its

insurance program triggered by an occurrence and proceed up the tower upon depletion of the policies within each layer of coverage." Olin IV, 864 F.3d at 145. The court pointed out that this approach was different from how it had previously required that damages "be swept back into the earliest triggered policy," and explained that after Viking Pump (NY), "the insured can pursue any insurer whose policy contains Condition C, and whose policy covers property damage during the relevant period, for all damage reaching the insurer's policy layer regardless of 'when' it took place." Olin IV at 144. The court held that policyholders "need not exhaust [other underlying] policies outside the policy year to reach the excess layer for its chosen policy year." Id. at 145 (emphasis added). Thus, because the Olin IV and Viking Pump (NY) courts explained that the policyholder choose a particular tower of coverage and proceed up it without first exhausting all other lower-level policies in the same tier, and neither court or any subsequent court has indicated that a policyholder must exhaust all policies in chronological order, the Court concludes that New York law allows the policyholder to control the order in which to seek payment from triggered policies when using an all sums method.[6]

---

[6] Defendants claim that Hopeman's settlements on a pro rata basis with other underlying insurers is a "manipulation of the claims" to avoid the application of the NCCs that is similar to permitting policyholders to assign damages in reverse chronological order to neutralize the effect of NCCs. See Defs.' Opp'n Partial Summ. J. Br. 14, ECF No. 82 (citing Liberty Mut. Ins.

Because the policyholder can choose the order in which to assign damages to triggered policies under an all sums method, it is speculative whether applying an all sums method to Plaintiff's settlements would necessarily have led to the triggering of prior policies in the same tier as Defendants' policies. In any case, Defendants' legal theory is unclear as to how Hopeman manipulated the claims here, and Defendants are also less than clear as to why and how the Court should act to mitigate the effect of such alleged claim manipulation. Thus, the Court will not apply the NCCs as if the policies had been exhausted under Defendants' counterfactual scenario.

### 4. Whether the Term "Loss" Has a Broad Meaning

The parties also dispute the meaning of the term "loss" in the relevant NCCs. The parties do not dispute that the following provision applies to the Lexington policies and the 1971-74 Continental Policy:

---

Co. v. Treesdale, Inc., 418 F.3d 330, 342 (3d Cir. 2005)). Defendants, however, have provided no evidence that plausibly establishes that Hopeman could have been seeking to avoid the application of the NCCs when it settled with the other insurers. In order to have "manipulated the claims," Hopeman would have had to predict years ahead of time all of the following: (1) that New York law would later recognize that the all sums allocation method and vertical exhaustion apply to policies with NCCs; (2) that New York law would later clarify that only payments made by prior policies in the same tier of coverage as the policy with the NCC are counted for purposes of applying the NCC; (3) that Defendants would refuse a settlement on a modified pro rata basis; and (4) that settling on a modified pro rata basis with other insurers would result in preventing the triggering of prior policies in the same tier as Defendants' policies. The Court finds utterly implausible the allegation that Hopeman was clairvoyant in acting as it did and "manipulated the claims." Thus, the Court is not persuaded that it should alter the application of the NCCs in order to mitigate the effect of any alleged claim manipulation.

> It is agreed that if any loss covered hereunder is also covered in whole or in part under any other excess Policy issued to the Assured prior to the inception date hereof the limit of liability hereon as stated in Item 5 and 6 of the Declarations shall be reduced by any amounts due to the Assured on account of such loss under such prior insurance.

See Ex. C at 41, ECF No. 1-3; Ex. D at 55, ECF No. 1-4; Home Policy, Ex. E at 64, ECF No. 1-5 (featuring an identical NCC to that above, except substituting the word "Insured" for "Assured"). Both sides also agree that the NCCs and underlying policies fail to define the term "loss," but they dispute whether this term should be construed narrowly or broadly.

Plaintiff claims that, because the Insurers have failed to define this term, it must be read consistently with plain meaning and an insured's reasonable expectations. Pl.'s Partial Summ. J. Reply Br. 12, ECF No. 115. Hopeman suggests that the Court should adopt the "indisputably reasonable definition" of "loss" from the Continental policies. Id. at 12-13. The Continental policies feature the following definition: "'Loss' means the sums paid as damages in settlement of a claim or in satisfaction of a judgment for which the insured is legally liable ...." Johnson Ex. 2 at 1860, ECF No. 82-3; Johnson Ex. 3 at 1870, ECF No. 82-4. In addition, Plaintiff claims that the term "loss," which is incorporated from the Home policy, should not be read as referring to similar losses from multiple claims. Pls.' Partial Summ. J. Br. 27-28. Hopeman notes that when the

47

Insurers intended to refer to "losses" resulting from multiple claims, they did so expressly. Id. As evidence Plaintiff cites the Home policy's "Loss Payable" provision, which uses language about the submission of a request for payment of "loss" for a definite claim and submissions of future "losses" for the same occurrence. Id. (quoting Johnson Ex. 8 at 1922, ECF No. 82-9). According to Hopeman, this demonstrates that the same "occurrence" can result in multiple "losses," showing that the "loss" limitation in the Home policy is even narrower than the "occurrence" limitation of the other NCCs. Id.

Defendants do not offer a preferred definition of the term "loss," but they deny that it should be construed narrowly. Defs.' Opp'n Partial Summ. J. 13, ECF No. 98. In support of their position, Defendants cite two cases in which federal courts have found that an undefined "loss" term in similar NCCs should be read broadly. First, the court in California Insurance Co. v. Stimson Lumber Co., No. Civ.01-514-HA., 2004 WL 1173185, *11 (D. Or. May 26, 2004) (Oregon law), found that the term loss had a broad meaning, and that it was not limited by any policy language to tie it to only those damages arising from individual occurrences. The court also determined that limiting the undefined "loss" term in an NCC to each individual claim would be unreasonable when viewed in light of the "ultimate net loss" provision. Id. "Ultimate net loss" was defined in many

of the policies at issue there as "the amount payable in settlement of the liability of the Insured after making deductions" for various other payments. Id. The court found that "the term 'loss' must be defined more broadly because 'loss' has none of the qualifiers found in the definition of 'ultimate net loss.'" Id. In New England Reinsurance Corp. v. Ferguson Enterprises, Inc., 208 F.Supp.3d 431, 436 (D. Conn. 2016) (California law), the court found that, in view of the whole policy, including its "ultimate net loss" definition, an undefined "loss" term should be "afforded a broad meaning and is not applicable only upon a single occurrence." Id. In light of these two cases, Defendants urge this Court to find that the term "loss" is not limited to only those damages arising from each individual occurrence. Defs.' Opp'n Partial Summ. J. Br. at 13.

The parties' dispute ultimately is about whether the NCC is ambiguous because it has an undefined term. The issue of whether an insurance contract is ambiguous is a question of law. Greenfield v. Philles Records, Inc., 98 N.Y.2d 562, 569, 780 N.E.2d 166, 170-71 (N.Y. 2002). "[T]he test to determine whether an insurance contract is ambiguous focuses on the reasonable expectations of the average insured upon reading the policy . . . and employing common speech." Mostow v. State Farm Ins. Companies, 88 N.Y.2d 321, 326-27, 668 N.E.2d 392 (N.Y.

1996). "A contract is unambiguous if the language it uses has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion.'" Greenfield, 780 N.E.2d at 170-71 (quoting Breed v. Insurance Co. of N. Am., 46 N.Y.2d 351, 355, 385 N.E.2d 1280 (N.Y. 1978)).

Turning to whether an undefined term is ambiguous, in general "an undefined term in an insurance policy is to be construed so as to give the term its ordinary and accepted meaning." Sloman v. First Fortis Life Ins. Co., 698 N.Y.S.2d 295, 297 (N.Y. App. Div. 1999). "[A]n ambiguity does not arise from an undefined term in a policy merely because the parties dispute the meaning of that term." Hansard v. Fed. Ins. Co., 46 N.Y.S.3d 163, 167 (N.Y. App. Div. 2017).

In approaching this inquiry, the Court begins with the plain and ordinary meaning of the word "loss." Courts in New York usually invoke dictionary definitions to determine the "plain and ordinary meaning" of words found in a contract. 10 Ellicott Square, 634 F.3d at 120 (2d Cir. 2011) (quoting Mazzola v. Cnty. of Suffolk, 143 A.D.2d 734, 735 (N.Y. App. Div. 1988)); see also Lend Lease (U.S.) Const. LMB Inc. v. Zurich Am. Ins. Co., 136 A.D.3d 52, 56 (N.Y. App. Div. 2015). One applicable dictionary definition of "loss" is "the amount of an insured's

financial detriment due to the occurrence of a stipulated contingent event (as death, injury, destruction, or damage) in such a manner as to charge the insurer with a liability under the terms of the policy." Webster's Third New International Dictionary 1338 (1993). This definition, which refers to the "amount of an insured's financial detriment" arising from covered events, is inherently broad and would include an insured's total liability arising from a particular category of harm. Additionally, the determiner "any" broadens the term "loss" such that it refers to all loss arising under a policy. Applying this plain and ordinary meaning to "loss" and "any," the Court finds that the term "any loss covered hereunder" has a plain meaning that is broad enough to mean the gross amount that a policyholder is seeking in its claim under a policy. This conclusion is strengthened in particular for the 1971-74 Continental policy because it incorporates an "ultimate net loss" that, as in Stimson and New England Reinsurance, demonstrates that "loss" is a broad term.

This Court's reading of this term is consistent with that of the Stimson and New England Reinsurance courts mentioned above, and also that of the three other courts which have construed this same term in similar NCCs. See, e.g., Air & Liquid Sys. Corp. v. Allianz Underwriters Ins. Co., No. CIV.A. 11-247, 2013 WL 5436934, at *27 (W.D. Pa. Sept. 27, 2013)

(rejecting policyholder's argument that "loss" in an identical NCC meant "any amounts due for a particular asbestos claim"); Ashland Inc. v. Aetna Casualty, Civ. A. No. 5:98-00340-JMH, slip op. at 12-13 (E.D. Ky. May 2, 2006) (finding that an identical NCC "applies broadly to 'any other excess policy' that covers the same loss as the Ashland INA Excess Policies", and applying the loss amount aggregated from multiple asbestos claimants to reduce the limits of various excess policies to zero); Greene, Tweed & Co. v. Hartford Acc. & Indem. Co., No. CIV.A. 03-3637, 2006 WL 1050110, at *12 (E.D. Pa. Apr. 21, 2006) (construing a nearly identical NCC and stating that "this court finds that the only reasonable interpretation of 'loss' as used in the American Home Non-Cumulation Clause is that the term means the gross amount Greene Tweed is seeking in its claim under the American Home Policy"); see also Stonewall Ins. Co. v. E.I. du Pont de Nemours & Co., 996 A.2d 1254, 1260-61 (Del. 2010) (noting that the term "loss" in an identical NCC "may be read broadly to include the entire loss"). The Court is also not aware of any court that has accepted the arguments that this NCC is ambiguous because the term "loss" is undefined or that the term "loss" should otherwise be construed narrowly.

None of Plaintiff's arguments regarding "loss" convince this Court that the term is either ambiguous or that it has an unambiguously narrow meaning. While Hopeman urges the Court to

52

accept the definition of "loss" from the Continental policies, New York law does not support arbitrarily selecting a definition for an undefined term from another insurance contract. An undefined term must be defined by its ordinary and accepted meaning. See Sloman, 698 N.Y.S.2d at 297. As to Hopeman's argument that because "loss" is written in the singular in the NCCs that it should therefore not be read to mean similar losses from multiple claims, the Court notes that the singular term "loss" can reasonably be referring to a single gross sum sought under a policy. Thus, there is no inconsistency, as Plaintiff asserts, in noting that the contract uses the term "losses" in reference to multiple "payments" in the Loss Payable provision, but that it uses the term "loss" in the NCC to refer to a single gross sum.

Therefore, because this issue presents a question of contract interpretation for the Court, and because the Court finds that the term "loss" in the NCCs unambiguously refers to the gross amount Hopeman is seeking under each policy, summary judgment on this issue is warranted. Seiden Assocs., 959 F.2d at 428. The Court **GRANTS** summary judgment to Defendants on this issue, finding that the undefined term "loss" should be construed broadly, ECF No. 83, and **DENIES** summary judgment to Plaintiff, ECF No. 81.

### D. Whether the Lexington Policies Include Defense Coverage

The Court next addresses the parties' cross-motions regarding whether the Lexington policies include defense coverage. The parties' dispute here concerns whether Lexington is liable for various costs associated with defending Hopeman against lawsuits for damages covered under the instant policies.

Excess liability insurance policies typically include a provision explaining what the insurers' obligations are in regards to defense coverage or the indemnification of defense costs. Some excess insurance policies provide for a "duty to defend," which obligates the insurer to provide a defense for the insured against claims that appear to fall within the coverage of the policy. 1 New Appleman Law of Liability Insurance § 1.05 (2017). However, most excess policies provide for a more limited "duty to indemnify," meaning that the insurer is obligated only to pay damages awarded against its insured for covered claims and other defense costs, as stated in the policy. Id. Where a policy indemnifies for defense costs, it may provide either for "defense within limits," meaning that payment of defense costs by an insurer reduces the amount available to pay judgments or settlements, or for "defense outside limits," meaning that defense costs do not reduce the available policy limits. Id.

Plaintiff asserts that the 1971-74 Lexington policy

provides for the indemnification of defense costs within limits and that the 1974-77 Lexington policy provides for defense costs outside limits, that is, in addition to limits.  Pl.'s Partial Summ. J. Br. 10, ECF No. 82.  Concerning the 1971-74 Lexington policy, Plaintiff contends that it incorporates the terms of the underlying INA and Home policies, both of which allegedly include a duty to indemnify defense costs within limits.  Id. As to the 1974-77 Lexington policy, Plaintiff asserts that the underlying Liberty policy provides for defense costs outside of limits, while the Aetna Policy excludes the indemnification of all defense costs.  Id. at 11.  Hopeman claims that, because the 1974-77 Lexington Policy follows form to inconsistent underlying insurance policies and does not specify that the narrower term applies, the follow form provision is ambiguous and must be interpreted in favor of coverage.  Id. at 11.

Defendants claim that the 1971-74 Lexington policy only reimburses defense costs paid as a consequence of a covered occurrence and that the 1974-77 Lexington policy does not provide coverage for defense costs at all.  Defs.' Summ. J. Br. 26, ECF No. 84.  Defendants claim that the 1971-74 Lexington policy incorporates a provision from the allegedly "immediately underlying" Home policy, which only provides for the reimbursement of defense costs paid as a consequence of a covered occurrence.  Id.  Concerning the 1974-77 Lexington

policy, Defendants claim that it incorporates an applicable provision from the "immediately underlying" Aetna policy, which does not provide for defense costs at all. Id.

Both sides raise arguments based on the effect of the policies' follow form provisions. Follow form provisions are common in multi-layer insurance and provide that an excess policy incorporates by reference certain terms, conditions and exclusions of the underlying policy or policies. See 3 Jeffrey E. Thomas et al., New Appleman Insurance Law Practice Guide § 29A.02 (2017). In general, where there is a conflict between the terms of the excess policy and any underlying policy, the terms of the excess policy control. See Home Ins. Co. v. Am. Home Prod. Corp., 902 F.2d 1111, 1113 (2d Cir. 1990) (deciding under New York Law that the terms of the excess policy governed where there was a conflict); see also 3 Thomas, supra, § 29A.02.

Determining which provisions a following form policy incorporates is straightforward when there is one underlying policy, but can become more complicated where there are two or more underlying policies. Where there are multiple underlying policies, the following form policy may include a standard provision designating which of the underlying policies is to be followed: "[f]or example, the policy might provide that it follows the primary policy; the immediate underlying policy; the lead excess or umbrella policy; or the primary policy or the

most restrictive provisions of any underlying excess policy." 3 Thomas, supra § 29A.02.

Where the following form policy fails to make such a designation, however, courts may find the policy to be either ambiguous or unambiguous depending on whether the underlying policies conflict.  Where one underlying policy has a provision on which another is silent, a court may find that the policies are unambiguous and apply the additional provision.  See, e.g., GenCorp, Inc. v. Am. Int'l Underwriters, 178 F.3d 804, 828 (6th Cir. 1999) (finding under Ohio law that follow form "language . . . phrased in the conjunctive" incorporated one underlying policy's exclusion).    Where the underlying policies have directly conflicting provisions, however, at least one court has found the following form policy to be ambiguous.    See Mine Safety Appliances Co. v. AIU Ins. Co., No. CV N10C-07-241 MMJ, 2015 WL 5829461, at *7 (Del. Super. Ct. Aug. 10, 2015) (unpublished) (Pennsylvania law) ("One policy, however, has conflicting underlying policy language . . . One policy includes defense costs, and the other excludes defense costs. This conflict creates an ambiguity, preventing summary judgment on this policy.")    In addition, where a follow form provision designates a particular type of policy to be followed but then fails to make clear which of the underlying policies of such type is the designated policy, at least one court has found that

the following form provision was ambiguous and should be
construed in favor of the insured.   See Rummel v. St. Paul
Surplus Lines Ins. Co., 945 P.2d 985, 990-991 (N.M. 1997)
(finding under New Mexico law that where a follow form provision
designated that the "immediate underlying policy" was to be
followed, but then failed to designate the immediately
underlying policy, that the policy was ambiguous and must be
construed against the insurer); see also John H. Mathias et al.,
Insurance Coverage Disputes (LJP) § 1.03 (2017) ("Where the
following form policy is silent on how to resolve conflicts in
wording with the underlying policy or policies it purports to
follow, however, the conflict should be resolved in the manner
most favorable to the policyholder.")

### 1. The Lexington Policy Follow Form Provisions

Having described the general standards for construing
follow form provisions, the Court now turns to interpret those
provisions of the instant Lexington policies.   This analysis
begins with the language of each policy.   Item 2 of the
Declarations in the 1971-74 Lexington policy identifies the
policy's "Underlying Umbrella Insurers" as the "Home Insurance
Company – Policy No. to be advised" and "Varuous [sic] Companies
and Policies."   Ex. 5 at 2611, ECF No. 84-5.   Endorsement #1 in
the 1974-77 policy identifies the Underlying Umbrella Insurers

as "(a) Liberty Mutual – Various" and "(b) Aetna C & S."  Ex. 7
at 2636, ECF No. 84-7.

Each  Lexington  policy  contains  the  same  definition  of
coverage, which states:

> The Company hereby agrees, subject to the limitations,
> terms  and  conditions  hereinafter  mentioned,  to
> indemnify the Assured for all sums which the Assured
> shall be obliged to pay by reason of the liability . .
> .  [c]aused  by  or  arising  out  of  each  occurrence
> happening anywhere in the world, and arising out of
> the  hazards  covered  by  and  **as  defined  in  the
> Underlying Umbrella Policies stated in Item 2 of the
> Declarations and issued by the "Underlying Umbrella
> Insurers."**

Ex. 5 at  2614, ECF No.  84-5; Ex.  7 at 2641, ECF No.  84-7
(emphasis added).  Both policies also feature a Maintenance of
Underlying Umbrella Insurance provision, which provides:

> **This Policy is subject to the same terms, definitions,
> exclusions  and  conditions  (except  as  regards  the
> premium, the amount and limits of liability and except
> as otherwise provided herein) as are contained in or
> as may be added to the Underlying Umbrella Policies
> stated in Item 2 of the Declarations** prior to the
> happening of an occurrence for which claim is made
> hereunder.

Ex. 5 at 2615(emphasis added); Ex. 7 at 2642.  Outside of the
above-cited provisions, the Lexington policies do not otherwise
clarify the follow form provisions.

Based  on  this  language,  the  Court  reaches  several
conclusions.  First, the Lexington policies fail to designate an
"immediate  underlying  insurer"  or  to  establish  that  the
immediately underlying insurer is the followed policy.  Second,

the policies do not indicate any other criteria for determining which underlying policy is to be followed. The language in the Maintenance of Underlying Umbrella Insurance and the Coverage provisions simply states that the policies incorporate the terms, conditions, and exclusions of the policies of the "Underlying Umbrella Insurers." Third, the policy language establishes that the policies follow form to the underlying policies only to the extent that they are consistent with the Lexington policies. See Ex. 5 at 2615 (stating the policy incorporates the terms of the underlying policies "except as otherwise provided herein"); Ex. 7 at 2642 (same). The Second Circuit has held that such language establishes a clear intent to have the excess policy's terms control in case of a conflict. See Home Ins. Co., 902 F.2d at 1113 (finding under New York law that a follow form provision that stated that the following policy was "subject to the same warranties, terms and conditions (except as otherwise provided herein) as are contained in . . . the Underlying Coverage" meant that the terms of the excess policy governed in case of a conflict).

While the Lexington policies do not contain any language clarifying which of the underlying policies should prevail if their terms conflict, Lexington argues that one can infer the priority from the underlying policies themselves. Lexington points to language in the 1971-74 INA and 1974-77 Aetna policies

60

in which they respectively list the Home and Liberty Umbrella policies as sitting under the INA and Aetna policies.  See INA policy, Ex. F at 76, 79, ECF No. 1-6 (stating that the INA policy is excess of the Home Insurance Company policy); Aetna Policy, Johnson Ex. 11 at 1972, ECF No. 82-12 (listing Aetna as excess of the Liberty Mutual policy).  Lexington argues that this establishes that the INA and Aetna policies are the "immediate underlying policies."  Defs.' Opp'n to Partial Summ. J. Br. 22; Defs.' Summ. J. Br.  27. Even if this were true, the Lexington policies do not specify that the immediate underlying policies govern in the case of a conflict.  As mentioned above, there are numerous possible ways that a following form policy can designate which policy should be followed, and the immediate underlying policy is not by default the followed policy.  See 3 Thomas, supra, § 29A.02.  In the absence of a provision designating that the immediately underlying policy is to be followed, the Court declines to read such a provision into the policies.  Thus, the Court finds that the 1971-74 policy follows form equally to both the Home and INA policies and that the 1974-77 policy follows form equally to the Aetna and Liberty Umbrella policies.

### 2. Whether the 1971-74 Lexington Policy Includes Defense Coverage

The Court next turns to the question of whether the

underlying policies of the 1971-74 Lexington policy include defense coverage.  The INA policy provides that:

> C. The insurance afforded by this certificate shall follow that of the primary insurance except:
>
> (1) anything in this certificate or the primary insurance to the contrary notwithstanding, <u>INA shall not be obligated to assume charge of the settlement or defense of any claim or suit brought or proceeding instituted against the Insured.</u>

Ex. F at 2, ECF No. 1-6 (emphasis added).

This language establishes that the INA policy does not include a duty to defend.  However, the duty to defend is broader than the duty to indemnify, <u>Cont'l Cas. Co. v. Employers Ins. Co. of Wausau</u>, 60 A.D.3d 128, 142, 871 N.Y.S.2d 48 (N.Y. App. Div. 2008) [hereinafter "<u>Keasbey</u>"].  Thus, this language does not exclude the possibility that the Lexington policy may include a duty to indemnify for defense costs.

The 1971-74 Lexington policy also follows form to the Home policy, which includes relevant language regarding defense coverage in its "Ultimate Net Loss" provision.  The 1971-74 Lexington policy provides that "it is expressly agreed that liability shall attach to the Company only after the Underlying Umbrella Insurers have paid or have been held liable to pay the full amount of their respective <u>ultimate net loss</u> liability" and that the "Company shall then be liable to pay only the excess thereof up to a further <u>ultimate net loss</u> in all in [sic]

respect of each occurrence". Ex. C at 40-41, ECF No. 1-3 (emphasis added). The term "ultimate net loss" is not defined in the Lexington policy, but it incorporates a definition from the Home Policy, which states:

> The term "Ultimate Net Loss" shall mean the total sum which the Insured, or any company as his insurer, or both, become obligated to pay by reason of personal injury, property damage or advertising liability claims, either through adjudication or compromise, and shall also include hospital, medical, and funeral charges and all sums paid as salaries, compensation fees, charges and law costs, premiums on attachment or appeal bonds, interest, expenses for doctors, lawyers, nurses and investigators and other persons, and for litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder, excluding only the salaries of the Insured's or of any underlying insurer's permanent employees. The Company shall not be liable for expenses as aforesaid when such expenses are included in other valid and collectible insurance.

Ex. E at 64-65, ECF No. 1-5 (emphasis added).

This language unambiguously provides that defense costs are only covered if (1) they are "paid as a consequence" of a covered occurrence and (2) the fact that an occurrence is covered has been established "through adjudication or compromise." The ultimate net loss provision of the Home policy, which the 1971-74 Lexington policy incorporates, therefore excludes those defense costs associated with unsuccessful suits that either fail at trial or that do not result in settlement. New York courts have described policies with similar language as providing that the obligation to

reimburse defense costs follows the indemnity obligations as a matter of law. Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp., 73 F.3d 1178, 1219 (2d Cir. 1995) (affirming the district court's ruling that "under policies containing a duty to reimburse defense costs but not a duty to defend, the Insurers have a duty to reimburse defense costs for claims that are established to be covered through judgment and settlement, and not for claims only potentially falling within the policy's coverage"). This is consistent with the approach of other jurisdictions. See In the Matter of Celotex Corp., 152 B.R. 661, 666 (M.D. Fl. 1993) ("Absent a covered loss, the excess insurers have no duty to indemnify whatsoever"). This also reflects the difference under New York law between the duty to defend and the duty to indemnify. See Servidone Const. Corp v. Sec. Ins. Co. of Hartford, 64 N.Y.2d 419, 424 (1985) ("The duty to indemnify is, however, distinctly different. The duty to defend is measured against the allegations of pleadings but the duty to pay is determined by the actual basis for the insured's liability to a third person.")

Plaintiff's reliance on Federal Insurance Co. v. Kozlowski, 792 N.Y.S.2d 397 (N.Y. App. Div. 2005), to argue that the Home provision provides for a duty to reimburse defenses costs even when a claim is not established by judgment or settlement, is unavailing. See Pl.'s Opp'n Summ. J., Br. 29, ECF No 97. In

Kozlowski, the court did require the insurer to pay defense costs prior to the payment of a judgment, but the policy at issue was a directors and officers liability insurance policy that required the advancement of defenses costs subject to recoupment if the claim was found ultimately not to be covered. Id. at 403-04. There is no such provision requiring the advancement of defense costs in the instant policies, and therefore Kozlowski is not on point.

As mentioned above, where one underlying policy includes a provision on an issue for which a second underlying policy is silent, and the following form policy does not indicate which policy is to be followed, the following form policy is unambiguous and the additional provision is incorporated. Here, the INA policy excludes defense coverage but is silent as to the indemnification of defense costs, while the Home policy also excludes defense coverage but unambiguously provides for defense costs within limits. Because the Lexington policy states that it follows the "terms, definitions, exclusions and conditions" of the underlying policies and therefore incorporates the Home policy's ultimate net loss definition, and the Home policy's ultimate net loss definition provides for defense costs within limits while the INA policy is silent on such costs, the Lexington policy is unambiguous and provides for defense costs within limits.

Therefore, because this issue presents a question of contract interpretation for the Court, and because the Court finds that 1971-74 Lexington policy unambiguously incorporates the terms of the Home policy, summary judgment on this issue is warranted.  Seiden Assocs., 959 F.2d at 428.  The Court **GRANTS** summary judgment to Lexington on this issue, finding that the 1971-74 policy only provides for the reimbursement of defense costs within limits, and also only provides for reimbursement of defense costs paid as a consequence of a covered occurrence. ECF No. 83.  The Court **DENIES** summary judgment to Plaintiff on the same issue.  ECF No. 81.

### 3. Whether the 1974-77 Lexington Policy Includes Defense Coverage

The Court turns next to address the defense obligations of the 1974-77 Lexington policy.  The underlying Aetna policy states that the company will "indemnify the INSURED against EXCESS NET LOSS arising out of an accident or occurrence[.]" Johnson Ex. 11 at 1970, ECF No. 82-12.  It also provides that "[l]oss shall not include any costs or expense in connection with the investigation or defense of claims or suits, or interest on any judgment which accrues after entry of the judgment."  Id. at 1971.  The parties do not dispute that this language expressly excludes defense coverage and the indemnification of any defense costs.

66

The underlying Liberty Umbrella policy's Investigation,
Defense, Settlement, Assistance and Cooperation provision
provides that:

> With respect to personal injury, property damage or
> advertising injury or damage covered under this policy
> (or which would be covered but for the insured's
> retention as stated in the declarations), **but not
> covered under any underlying policy or any other
> insurance**, the company will:
>
> (1) defend any suit against the insured seeking
> damages on account thereof, even if such suit is
> groundless, false or fraudulent; but the company may
> make such investigation and settlement of any claim or
> suit as it deems expedient;
> . . .
> and **the amounts so incurred**, except settlement of
> claims and suits, are not subject to the insured's
> retention as stated in the declarations and **are
> payable by the [insurance] company in addition to the
> applicable limit of liability of this policy**.

Johnson Ex. 10 at 1946, ECF No. 82-11 (emphasis added).

Lexington argues that, despite the plain language in this
provision apparently establishing its obligation to indemnify
defense costs in addition to limits, a closer reading reveals
that it only creates defense obligations when claims are "not
covered under any underlying policy or any other insurance."
Defs.' Opp'n Partial Summ. J. Br. 23. In support of its
position, Lexington cites Liberty Mutual Insurance Co. v.
Pacific Indemnity Co., 579 F. Supp. 140, 144-45 (W.D. Pa. 1984)
(Pennsylvania law). In that case, the court interpreted
identical language from another Liberty policy and found that,

where there were two unexhausted primary policies providing coverage for defense costs, there was "no obligation under the Liberty Mutual excess policy for costs of defense." Id. at 145.

In response, Plaintiff notes that, in In re Viking Pump, 148 A.3d 633 (Del. 2016) [hereinafter Viking Pump (Del.)] (New York law), the Delaware Supreme Court rejected an identical interpretation of the term "covered" to that offered by Defendants. Pl.'s Partial Summ. J. Reply Br. 15, ECF No. 115. In that case, the excess insurers asserted that the use of the term "covered" should be construed as referring to "whether the primary policy provides coverage and not to whether it is collectible." Viking Pump (Del.), 148 A.3d at 661. The excess insurers argued that, even if the primary policies were exhausted, the claims would still be "covered" by a primary policy and therefore Liberty would incur no defense obligations under its umbrella policies. Id. The court analyzed whether this interpretation was consistent with the coverage section and the definition of "retained limit" and found that multiple provisions evinced a purpose for the Liberty policy to provide coverage after the underlying policies were exhausted. Id. at 662. The court concluded that "in the context of this multi-layered, comprehensive insurance coverage program, and considering the general purpose of the Liberty umbrella policies, the reasonable expectation of the average insured

68

would be that 'covered under' concerns whether the underlying insurance is collectible," and therefore that "Liberty has defense obligations under its umbrella policy." Id.

The Court finds the well-reasoned opinions of both the Viking Pump (Del.) and Liberty Mutual courts to be persuasive and to not conflict with one another. Liberty Mutual holds merely that, where there is an unexhausted primary policy that is obligated to provide defense coverage for certain claims, those claims are "covered" by the primary policy such that the umbrella policy has no defense obligations. 579 F. Supp. at 145. Viking Pump (Del.) establishes that an obligation to indemnify defense costs does arise, however, when the claims are no longer "covered under" another policy due to that policy's exhaustion. 148 A.3d at 661. The Court therefore rejects Lexington's argument that the Liberty Umbrella policy's language precludes it from having defense obligations if an exhausted underlying policy would otherwise have covered the claim, finding instead that the Liberty Umbrella policy unambiguously provides for defense coverage in addition to limits where underlying policies have been exhausted.

Because the Aetna and Liberty Umbrella policies are inconsistent with one another, and the Lexington policy does not designate which policy is to be followed, the Court finds that the 1974-77 Lexington policy's follow form provision is

ambiguous.   New York law establishes that where a provision of
an insurance contract is ambiguous, the court must afford the
parties the opportunity to adduce extrinsic evidence to
determine the intent of the parties.  See Schering Corp. v. Home
Ins. Co., 712 F.2d 4, 9 (2d Cir. 1983); Uniroyal, Inc. v. Home
Ins. Co., 707 F. Supp. 1368, 1374 (E.D.N.Y. 1988) (citing Ploen
v. Aetna Casualty and Surety Co., 138 Misc.2d 704, 525 N.Y.S. 2d
522, 524 (Sup. Ct. Nassau Co. 1988)); 1 Dunham, supra, § 15.02
("However, where the terms of an insurance policy are ambiguous—
admitting more than one reasonable interpretation—the court will
seek to exhaust every effort to resolve the ambiguity to
determine the intent of the parties, including resorting to
extrinsic evidence.").   Thus, because the 1974-77 Lexington
policy follows form to conflicting underlying policies and does
not specify which policy's terms should govern, the 1974-77
Lexington policy is ambiguous regarding its defense coverage
obligations, and summary judgment regarding this issue is
precluded.   The Court thus **DENIES** summary judgment to Plaintiff,
ECF No. 81, and **DENIES** summary judgment to Defendants, ECF No.
83, on this issue.

### E. Whether Substantial Exposure to Asbestos is Acceptable Evidence of Injury-in-Fact

The Court next addresses Plaintiff's motion for summary
judgment regarding the proper trigger for injury-in-fact.  Pl.'s

Mot. Partial Summ. J. 2, ECF No. 81.   Both parties agree that New York courts apply an "injury-in-fact"[7] standard to determine the trigger for coverage.   The parties disagree about what the applicable trigger of coverage is with respect to asbestos-related bodily injury, and their dispute centers on the injury-in-fact trigger featured in the New York Appellate Division's decision in Keasbey, 871 N.Y.S.2d 48.

Hopeman argues that the trigger for injury-in-fact differs by whether a claim falls into either "products/completed operations" or "operations" coverage.   Pl.'s Partial Summ. J. Br. 20, ECF No. 82.   While Hopeman admits that Keasbey establishes a demanding bodily injury standard, Plaintiff claims that Keasbey indicates that this standard only applies to "operations" claims.   Id.   As to the trigger for "products/completed operations" claims, Hopeman seeks a ruling that "dates of first substantial exposure are acceptable evidence of injury-in-fact trigger."   Pl.'s Mot. for Partial Summ. J. 2, ECF No. 81.   Hopeman also requests a ruling that as to a person "who ultimately develops lung cancer, mesothelioma, or nonmalignant asbestos-related disease, bodily injury first

---

[7] "Under New York law, courts will give effect to general liability policy language specifying that coverage is triggered by bodily injury 'during the policy period,' by requiring the policyholder to show that an 'injury-in-fact,' i.e., an actual rather than a presumed injury, occurred during the policy period."   2 Dunham, supra § 18.03[3][a].   "In the toxic tort context, complex medical evidence often must be presented to prove the timing of an injury-in-fact before an insurer will be required to indemnify against a particular loss."   Id.

occurs, for policy purposes, upon cellular and molecular damage caused by asbestos inhalation, and such cellular and molecular damage occurs during each and every period of an asbestos claimant's significant exposure to asbestos and continues thereafter." Id. at 2-3.

Defendants claim that the controlling law on trigger in asbestos-related bodily injury cases is Keasbey. Defs.' Opp'n Partial Summ. J. Br. 17, ECF No. 98 (citing Keasbey, 871 N.Y.S.2d at 60–61). According to Defendants, Keasbey established that asbestos-related "bodily injury" occurs when "asbestos fibers overwhelm[] the body's defenses." Id. at 18 (quoting Keasbey, 871 N.Y.S.2d at 63). They vehemently deny that this injury standard only applies to "operations" coverage, as they note that Keasbey held that "operations" injuries differ from "products/completed operations" claims only with respect to the timing of when the injuries occur. Id. at 17. They conclude that, based on the relevant policy language, Hopeman bears the burden of establishing injury-in-fact during each relevant policy period and must produce medical evidence that establishes that the point where asbestos fibers overwhelmed the body's defenses was during a Lexington or Continental policy period. Id. at 19.

As a starting point for the trigger of coverage analysis, the Court must look to the applicable policy provisions in the

72

instant policies.   The Continental policies each provide that "[t]his policy applies to injury . . . taking place during this policy period[.]" Johnson Ex. 2 at 1860, ECF No. 82-3, and Johnson Ex. 3 at 1870, ECF No. 82-4.   The Lexington policies provide that they "indemnify the Assured for all sums which the Assured shall be obliged to pay by reason of liability . . . for damage . . . and expenses on account of:- (i) Personal Injuries, including death at any time resulting therefrom, . . . Caused by or arising out of each occurrence . . . arising out of the hazards covered by and defined in the Underlying Umbrella policies . . . ." Johnson Ex. 4 at 1888, ECF No. 82-5; Johnson Ex. 5 at 1902, ECF No. 82-6.   These policies each follow form to further definitions of injury and occurrence from the underlying policies.[8]   Under all the policies, it is "bodily injury" that triggers coverage, and the insured must show that an injury occurred during the policy period and that it occurred as a result of an injurious exposure.   See Keasbey, 60 A.D.3d at 144;

---

[8]  The 1971-74 Continental and Lexington policies incorporate several definitions from the Home policy.   The incorporated definitions include "personal injury," which is defined as "bodily injury, mental injury, mental anguish, shock, sickness, disease, disability . . .", and "occurrence," which is defined as "an accident or happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, property damage or advertising liability during the policy period." Johnson Ex. 8 at 1921, ECF No. 82-9.   The 1974-77 Continental and Lexington policies follow form to definitions from the Liberty policy, including "personal injury," which is defined as "personal injury or bodily injury which occurs during the policy period," "bodily injury," which is defined as including "sickness or disease or death resulting at any time therefrom[,]" and "occurrence," which is defined as "injurious exposure to conditions, which results in personal injury . . . ." Johnson Ex. 10 at 1947.

see also 2 Dunham, supra, § 15.03 ("Because the policyholder bears the initial burden of demonstrating coverage, it is the policyholder's burden in the first instance to show that covered bodily injury has occurred.")

In general, the determination of what constitutes an injury-in-fact under New York law is fact-specific and must be made according to the facts and medical evidence presented in a particular case. See Am. Home Prod. Corp. v. Liberty Mut. Ins. Co., 748 F.2d 760, 765 (2d Cir. 1984); 2 Dunham, supra, § 18.03 (noting that "injury-in-fact must be established by the evidence on a case-by-case basis"). Because the determination of injury-in-fact depends upon the medical evidence presented in a particular case, triers of fact may reasonably come to different conclusions as to when coverage is triggered with regards to a particular disease or type of injury. See Asbestos Claims Mgmt. Corp., 73 F.3d at 1194-95, 1197 (New York law) (noting that injury-in-fact may be shown by competent evidence to result at all points where "identifiable injury" occurs); id. at 1197 (noting that a trier of fact could find that an asbestos-related injury-in-fact occurs "throughout the period between exposure and date of claim or death in all cases in which evidence persuades the trier of fact that successive injuries are recurring."); see also 4 Thomas, supra, § 39.15 (stating that a continuous injury trigger and an injury-in-fact trigger will

produce similar results when injury is deemed to occur at first exposure, but will reach different results when evidence in a particular case demonstrates that injury-in-fact occurs after first exposure).

New York law has also established several other broad rules regarding trigger for asbestos-related bodily injury.  First, "[a]n injury-in-fact need not be manifest, diagnosable or compensable in order to constitute 'bodily injury' triggering coverage[.]"  2 Dunham, supra, § 15.03 (citing Am. Home Prod., 748 F.2d 765-766).  Second, courts applying New York law reject all "presumed" injury triggers.  2 Dunham, supra, § 18.03 (collecting cases).

Having noted that injury-in-fact under New York law is determined on a case-by-case basis and depends upon the particular medical evidence presented in a case, the Court now turns to address the Keasbey court's findings regarding trigger of coverage.  The trial court in Keasbey found that "injury happens at inhalation."  871 N.Y.S.2d at 53.  On appeal, the Appellate Division stated that the trial court had "all but ignored the testimony of medical experts that went largely uncontroverted at trial."  Id. at 60.  The court then recounted the relevant medical evidence presented in the case and found, based on the particular evidence presented in the case, that the bodily injury occurs at the point at which "asbestos fibers

overwhelm[] the body's defenses." Id. at 149; see also 2 Dunham, supra, § 18.03 (noting that the Keasbey court arrived at its trigger determination on the basis of the particular evidence presented in the case).

The Court does not read Keasbey as abrogating the prior case-by-case approach to determining injury-in-fact, and therefore the Court does not agree that Keasbey is binding precedent establishing a uniform trigger for other courts applying New York law with regards to this issue. If the Keasbey court intended to make such a drastic departure, one would expect that they would have plainly stated that that was what they were doing. Cf. R.T. Vanderbilt Co., Inc. v. Hartford Accident & Indem. Co., 156 A.3d 539, 559-71 (Conn. App. Ct. 2017) (Connecticut law) (rejecting a case-by-case approach to determining asbestos-related bodily injury and explaining at length its reasons for doing so). Defendants have pointed to nothing in Keasbey that suggests that the court intended to lock other triers of fact into accepting its factual findings, based on the evidence presented in that case, of the trigger for asbestos-related bodily injury. The Court also notes that, in addition to the opinions cited by the parties in Viking Pump III, 2013 WL 7098824, and ITT Cannon, Inc. v. ACE Property and Casualty Co., No. BC 290354 (Cal. Super Ct. L.A. Cnty., Aug. 17, 2017), both of which rejected Keasbey as controlling the issue

of what constitutes an asbestos-related "bodily injury" under New York law, a third court applying New York law also declined to read Keasbey to establish a uniform trigger as a matter of law in all cases. See Pac. Employers Ins. Co. v. Troy Belting & Supply Co., No. 1:11-CV-912, 2015 WL 5708360, at *4 (N.D.N.Y. Sept. 29, 2015) ("Keasbey seems to suggest that coverage is not triggered until an insured can 'demonstrate actual damage or injury during the policy period,' not just exposure. [Keasbey] at 148, 871 N.Y.S.2d 48.   The insurers do not argue, however, that the Keasbey approach would apply. Instead, their analysis of the amount owed is premised on the idea that coverage is triggered by exposure. Troy Belting does not appear to dispute that the trigger event is exposure. The Court will therefore accept the date of first exposure as the event that triggers coverage[.]").   In light of the long-standing approach under New York law of treating the trigger of coverage for asbestos-related bodily injury as a question of fact to be determined on a case-by-case basis, and in light of Defendants' failure to show that Keasbey altered this approach, the Court rejects Defendants' position that this Court is bound by the injury-in-fact findings featured in Keasbey.

While the Court finds that Keasbey does not establish a definition for asbestos-related "bodily injury" applicable to all courts applying New York law to insurance contracts, the

Court cannot agree with Plaintiff that Keasbey is distinguishable because its "bodily injury" determination was restricted to "operations" claims.  See Pl.'s Partial Summ. J. Br. 20-21, ECF No. 82 (citing ITT Cannon,  No. BC 290354, at 25 n.23; Viking Pump III, 2013 WL 7098824, at *18).  Plaintiff claims that ITT Cannon and Viking Pump III successfully distinguished Keasbey on this ground, but the Court is unpersuaded that anything in Keasbey supports such a view. Prior to describing its findings regarding trigger of coverage, the Keasbey court stated it was answering the following question: "what constitutes sufficient bodily injury to trigger coverage."  871 N.Y.S.2d at 61.  As Defendants rightly point out, the only distinction the Keasbey court made regarding bodily injury for operations claims was in regards to the timing of the injury, not the nature of the injury.  Id. at 63-64.  One other consideration that leads this Court to reject Plaintiff's interpretation of Keasbey is that the Court has been unable to find any authority showing that any other injury-in-fact jurisdiction applies a different "bodily injury" standard for operations claims as opposed to products/completed operations claims.  This makes sense in light of the fact that the insurance contracts that the Court is aware of do not use different language when describing bodily injuries that arise in one category as opposed to another.  Because Plaintiff has

pointed to no contractual language that shows that bodily injury changes based on whether a claim arises from operations or products/completed operations, and because the Court believes Plaintiff misconstrues Keasbey, the Court finds that the contractual language in these policies does not unambiguously establish that injury-in-fact differs by whether a claim falls into either "products/completed operations" or "operations" coverage. Hopeman is therefore not entitled to summary judgment on that issue, Seiden Assocs., 959 F.2d at 428, and the Court therefore **DENIES** Plaintiff's request for summary judgment on that issue. ECF No. 81.

Hopeman also requests summary judgment that its preferred injury-in-fact trigger applies to the contracts. Pl.'s Mot. Partial Summ. J. 2-3, ECF No. 81. However, because the injury-in-fact trigger involves a factual question that must be decided on the basis of the medical evidence presented in a case, summary judgment on this issue is premature. Though Hopeman entreats this Court to presume that the medical evidence to be presented in this case will be as convincing as that seen by the ITT Cannon and Viking Pump (Del.) courts, see Pl.'s Partial Summ. J. Br. at 21, the Court cannot grant Hopeman's request because the medical evidence from the other cases is not properly before this Court. Therefore the Court **DENIES** Plaintiff's request for summary judgment that, as to one "who

ultimately develops lung cancer, mesothelioma, or nonmalignant asbestos-related disease, bodily injury first occurs, for policy purposes, upon cellular and molecular damage caused by asbestos inhalation, and such cellular and molecular damage occurs during each and every period of an asbestos claimant's significant exposure to asbestos and continues thereafter." ECF No. 81. The Court likewise **DENIES** Plaintiff's request for summary judgment that the "dates of first substantial exposure are acceptable evidence of injury-in-fact trigger." Id.

### F. Whether Hopeman May Fill the Gap Created by Home's Insolvency

The Court next turns to the parties arguments regarding whether Hopeman may fill the gap created by the Home's insolvency. Defendants contend that Hopeman cannot exhaust the underlying limits for the 1971-74 Continental and Lexington policies because it has not and cannot receive payments from the Home Insurance Company that exhaust its policy. See Defs.' Summ. J. Br. 20-23, ECF No. 84. Defendants argue that, because the Home Insurance Company — which became insolvent in 2003 — has not made actual payment of the insurance limits, the contractual language from the 1971-74 Continental and Lexington policies requiring "payment" of the underlying limits cannot be satisfied. Id. Plaintiff replies that the underlying limits of the Continental and Lexington 1971-74 policies may be exhausted either by payment by Hopeman of an amount equivalent to the

underlying limits or by Home's having been "found liable to pay" its underlying limits.  Pl.'s Mot. Partial Summ. J. 2, ECF No. 82.

The facts regarding the Home policy are undisputed.  Prior to its insolvency, Home made no payments to Hopeman on any of its policies.  In 2013, Hopeman reached settlement with the liquidator of the Home Insurance Company, thereby resolving Hopeman's claims against seven Home policies.  Plaintiff later assigned its rights under those Home policies to a third party.

### 1. Relevant Policy Language

The 1971-74 Lexington policy contains the following Maintenance of Underlying Umbrella provision:

> It is a condition of this Policy that the Underlying Umbrella Policies shall be maintained in full effect during the currency hereof except for any reduction of the aggregate limits contained therein **solely by payment** of claims in respect of accidents and/or occurrences occurring during the period of this Policy or by the operation of Condition of the Underlying Umbrella Policies.

Ex. C at 41, ECF No. 1-3 (emphasis added).  The policy also contains the following Limit of Liability provision:

> It is expressly agreed that liability shall attach to the Company only after **the Underlying Umbrella Insurers have paid or have been held liable to pay** the full amount of their respective ultimate net loss liability as follows . . .

Ex. C at 39 (emphasis added).

The 1971-74 Continental policy provides that it will "indemnify the insured for the amount of loss which is in excess

of the applicable limits of liability of the underlying insurance[.]" Continental Policy, Ex. A at 12, ECF No. 1-1. Loss is defined in part as "**the sums paid** as damages in settlement of a claim or in satisfaction of a judgment for which the insured is legally liable[.]" Id. (emphasis added).

According to Defendants, the 1971-74 Continental and Lexington policies both incorporate the following Loss Payable Provision from the underlying Home policy:

> Liability under this policy with respect to any occurrence shall not attach unless and until **the Insured, or the Insured's underlying insurer**, shall have paid the amount of the underlying limits on account of such occurrence . . .

Ex. E at 66, ECF No. 1-5. (emphasis added).

The 1971-74 Continental Loss Payable provision follows form to the following language from the Home policy:

> In the event of reduction or exhaustion of the aggregate limits of liability under said underlying insurance **by reason of losses paid hereunder**, this policy shall
>
> > (1) in the event of reduction pay the excess of the reduced underlying limit.
> >
> > (2) In the event of exhaustion continue in force as underlying insurance.

Ex. E at 64, ECF No. 1-5 (emphasis added). The Maintenance of Underlying Policies Provision incorporated into the Continental Policy provides:

> It is a condition of this policy that the policy or policies referred to in the attached "Schedule of

Underlying Insurance"' shall be maintained in full effect during the currency of this policy except for any reduction of the aggregate limit or limits contained therein **solely by payment of claims** in respect of accidents and/or occurrences occurring during the period of this policy . . .

Home Policy, Ex. E at 66, ECF No. 1-5.

### 2. Relevant New York Caselaw

Defendants rely upon three cases to support their position that the underlying policies can only be exhausted by payments made by the underlying insurer. Defendants' first case, Forest Labs., Inc. v. Arch Insurance Co., 38 Misc. 3d 260 (N.Y. Sup. 2012), involved a policy that stated that liability would attach only after the "insurers of the Underlying Policies shall have paid in legal currency the full amount of the Underlying Limit for such Policy Period", and also required that actual payment be made "pursuant to the terms and conditions of the Underlying Insurance thereunder". Id. at 266 (emphasis added). The court found that this language unambiguously required actual payment by the underlying insurer. Id. at 267.

Comparing the Forest Labs policy with the Lexington policy, one notes that the policies have some similar language requiring that "Underlying Umbrella Insurers" or the "insurers of the Underlying Policy" pay the underlying limits. Ex. C at 39, ECF No. 1-5. However, the Forest Labs policy lacks the language from the Lexington policy about how the underlying policies can be exhausted if the underlying insurer has "been held liable to

pay" its limits.  The Continental policy is entirely dissimilar to the Forest Labs policy because it does not require that payments be made by the "insurers of the Underlying Policies," nor does it demand that any payment be made pursuant to the terms of the underlying insurance.  In contrast to the Forest Labs policy, the Continental policy also incorporates a Loss Payable provision stating that the policies attach after "the Insured, or the Insured's underlying insurer, shall have paid the amount of the underlying limits."  Forest Labs is thus instructive regarding some of the language in the Lexington policy, but it does not address the language in the Continental policy.

Defendants' second case, Ali v. Federal Insurance Co., 719 F.3d 83 (2d Cir. 2013), does not further clarify the policies. In Ali, the plaintiffs sought to access an excess insurance policy where two underlying insurers had become insolvent.  Id. at 87.  The plaintiffs argued that the policies were exhausted because they had incurred "obligations" equal to the attachment point.  Id. at 89.  The relevant language stated that excess liability coverage "shall attach only after all ... 'Underlying Insurance' has been exhausted by *payment* of claim(s)" and that exhaustion of the underlying insurance occurs "solely as a result of *payment* of losses thereunder[.]"  Id. at 91 (emphasis in original).  The district court found, and the Second Circuit

84

affirmed, that such language required actual payment that could not be satisfied by showing that the insured had suffered "obligations" or "losses" in amounts equal to the attachment point. Id. at 92. Neither court clarified, however, whether the requisite payments had to be made by the underlying insurer. The Second Circuit noted that "[t]he District Court never held that the underlying insurers must make payments before the obligations under the relevant excess policies are triggered. Rather, the District Court—echoing the terms of the relevant insurance policies—described the exhaustion requirement in the passive voice and did not specify which party was obligated to make the requisite payments." Id. The Second Circuit further found that the district court did not err in so doing because "[d]enying the Directors' request did not require ruling on whether the underlying insurers, in particular, were required to make payments[.]" In the Court's view, then, Ali is clear that the instant policies must be exhausted by payment (or by being "held liable to pay" the underlying limits in the case of the Lexington policy), but it does not support Defendants' contention that this payment cannot be made by Plaintiff.

The Court also does not find Defendants' third cited authority, In re Rapid-American Corporation, No. 13-10687 (SMB), 2016 WL 3292355 (Bankr. S.D.N.Y. June 7, 2016), to be helpful in understanding whether any payments must come from an underlying

insurer.  As in <u>Ali</u>, the plaintiffs in <u>Rapid-American</u> claimed that their "accrued liabilities" exhausted the underlying policies of the insolvent insurers.  <u>Id.</u> at 1.  The excess policies in that case featured exhaustion language similar to <u>Ali</u> in which actual payment was required.  <u>Id.</u> at *2-6.  The court, however, did not state whether the necessary payments had to be made by the underlying insurers.  <u>Id.</u> at 11.

Plaintiff cites a single case in support of its contention that the policies permit the insured to fill the gap.  In <u>Zeig v. Massachusetts Bonding & Insurance Co.</u>, 23 F. 2d 665 (2d Cir. 1928), the court interpreted an excess policy that required the primary insurance to be "exhausted in the payment of claims to the full amount of the expressed limit."  <u>Id.</u> at 666.  The court found that this language was ambiguous and did not require the underlying insurer to make full payment in cash on its policies, holding that the "claims are paid to the full amount of the policies, if they are settled and discharged, and the primary insurance is thereby exhausted."  <u>Id.</u>  The court noted that the parties could have made full payment in cash a condition precedent for the excess insurance, but that the defendant had "no rational interest in whether the insured collected the full amount of the primary policies, so long as it was only called upon to pay such a portion of the loss as was in excess of the limits of the policies."  <u>Id.</u>  <u>Zeig</u>, which remains a "seminal

decision interpreting New York insurance law" in the Second Circuit, Lexington Ins. Co. v. Tokio Marine & Nichido Fire Ins. Co., No. 11 CIV. 391 DAB, 2012 WL 1278005, at *3 (S.D.N.Y. Mar. 28, 2012) (collecting cases relying on Zeig), stands for the proposition that New York law permits an insured to fill the gap left by below-limits settlement with an underlying insurer where the policy leaves the terms "payment" or "exhaustion" ambiguous.

### 3. Relevant Caselaw from Outside New York

Outside of the four cases mentioned above, the parties do not cite additional New York caselaw in which courts have construed similar policy language regarding whether the insured can fill the gap.  The Court's own search for additional New York caselaw also did not turn up any applicable cases. Therefore, this Court looks to the persuasive authority of other jurisdictions.

In five cases, courts have found that a policy cannot be exhausted by the insured filling the gap when the policy contains language specifically indicating that the underlying insurer must make the requisite payment.  In Comerica Inc. v. Zurich American Insurance Co., 498 F. Supp. 2d 1019, 1029-30 (E.D. Mich. 2007) (Michigan law), the court found that a policy requiring "actual payment of loss thereunder by the applicable insurers" precluded exhaustion through "payments by the insured to fill the gap[.]"   In Great American Insurance Company v.

Bally Total Fitness Holding Corp., No. 06-CV-04554, 2010 WL
2542191, at *1 (N.D. Ill. June 22, 2010) (Illinois law), the
court ruled that below-limit settlements with insurers could not
exhaust two policies.  The first policy required payment by "the
insurers of the Underlying Policies" in "the full amount of the
Underlying Limit," and the second required that exhaustion must
be achieved by "payment of the total underlying limit of
insurance" in which "each and every Underlying Insurance Policy
has responded by payment of loss."  Id.  In Citigroup Inc. v.
Federal Insurance Company, 649 F.3d 367, 373 (5th Cir. 2011)
(Texas law), the Fifth Circuit held that four policies were not
triggered by below-limit settlements.  Three of the policies
included language clearly assigning the underlying insurer the
responsibility of making the payment. See id. (noting one policy
stating that attachment occurred only "after the total amount of
the Underlying Limit of Liability has been paid in legal
currency by the insurers of the Underlying Insurance as covered
loss thereunder," a second that coverage attaches only after
"all Underlying Insurance carriers have paid in cash their full
liabilities," and a third that coverage attached "only after any
Insurer subscribing to any Underlying Policy shall have agreed
to pay or have been held liable to pay the full amount of its
respective limits of liability.").  In Qualcomm, Inc. v. Certain
Underwriters At Lloyd's, London, 161 Cal. App. 4th 184, 195

(Cal. Ct. App. 2008) (California law), the court found that the insured could not fill the gap where the policy stated that coverage attached "only after the insurers under each of the Underlying policies have paid or have been held liable to pay the full amount of the Underlying Limit of Liability." In JP Morgan Chase & Co. v. Indian Harbor Insurance Co., 947 N.Y.S.2d 17, 21 (N.Y. App. Div. 2012) (Illinois law), the court found that a policy stating that coverage attached only after "the Underlying Insurer(s) shall have paid or have been held liable to pay, the full amount of the Underlying Limit(s)" precluded the insured from filling the gap. The five above-cited cases are persuasive authority for the proposition that a policyholder may not "fill the gap" when a policy includes specific language requiring the underlying insurer to make the requisite payments.

In three other cases, courts have split as to whether the insured can fill the gap where the relevant policy language does not clearly designate that the underlying insurer must make the requisite payments. In Citigroup, the Fifth Circuit found, in addition to the three policies mentioned above, that a fourth policy, which stated only that coverage attached after "the exhaustion of all of the limit(s) of liability of such 'Underlying Insurance' solely as a result of payment of loss thereunder," also required the underlying insurer to make the requisite payments. 649 F.3d at 373. The Fifth Circuit reached

its conclusion by purportedly adopting the _Comerica_ court's analysis. _Id._ However, the language in the policy at issue in _Comerica_ was much more specific than the policy language at issue in _Citigroup_. The policy in _Comerica_ required that exhaustion be made by "actual payment of loss thereunder by the applicable insurers[.]" 498 F. Supp. 2d at 1022. The _Comerica_ court's analysis thus properly applies to policy language that includes requirements for "actual payment" made by an "applicable insurer," and not to policies that fail to designate any party to make the requisite payments. Thus, the Court finds the _Citigroup_ court's decision to be inapposite to the instant policies because the reasoning it adopted from _Comerica_ spoke to policy language that is distinguishable from the instant policies.

In _Maximus, Inc. v. Twin City Fire Ins. Co._, 856 F. Supp. 2d 797, 804 (E.D. Va. 2012) (Virginia law), the court found that language requiring exhaustion "by actual payment under such Underlying Insurance" was ambiguous as to whether the insured could fill the gap. The court noted that the policy language simply did not supply a definition of "actual payment under such Underlying Insurance," and contrasted this language with that of the policies in _Comerica_, _Great American Insurance Co._, _Citigroup_, and _Qualcomm, Inc._, to highlight how the policies could have been made unambiguous. _Maximus_ at 801-804. The

90

Maximus court concluded that, in the absence of language
explicitly designating the underlying insurer as the only party
who could make the payments, the policy language was ambiguous.
Id. at 804.  The court then construed the policy in favor of the
insured and held that the insured was permitted to fill the gap.
Id.   The policy at issue in Maximus is similar to the
Continental policy in that both policies fail to include
specific language about payment needing to come from an
underlying insurer.  The Continental policy differs in that the
policy in Maximus required "actual payment" be made "under such
Underlying Insurance," and yet the Maximus court found that this
additional policy language was still ambiguous about whether the
policyholder could fill the gap.

    The Fifth Circuit also ruled in Martin Resource Management
Corp. v. AXIS Ins. Co, 803 F.3d 766, 769 (5th Cir. 2015) (Texas
law) that a policy could not be exhausted by filling the gap
where the policy stated that coverage attached "only after all
applicable Underlying Insurance . . . has been exhausted by
actual payment under such Underlying Insurance".  The court
reached this conclusion by applying the same reasoning it used
in Citigroup to conclude that the use of the phrase "payment of
loss . . . under such Underlying Insurance" requires that "the
underlying insurer must make actual payment to the insured."
Id. at 771 (emphasis added).  The court explicitly rejected the

analysis of the <u>Maximus</u> court, as it accused the <u>Maximus</u> court of having not analyzed the policy as a whole. <u>Id.</u> at 771-72.

### 4. Whether the Home Policy Can Be Exhausted for Purposes of the 1971-74 Lexington Policy

As to the 1971-74 Lexington policy, the above-cited cases are persuasive for the proposition that the Lexington policy can only be exhausted either by actual payment of the Home policy limits by the Home or by the Home being held liable to pay its underlying limits. The Lexington policy states that coverage attaches only after "<u>the Underlying Umbrella Insurers have paid</u> or have been held liable to pay the full amount of their respective ultimate net loss liability[.]" Ex. C at 40, ECF No. 1-3 (emphasis added). Courts who interpreted identical or similar language in <u>Forest Labs</u>, <u>Qualcomm</u>, and <u>JP Morgan</u> all found that this language precluded the insured from filling the gap. The Court therefore finds that this language unambiguously designates the underlying insurer as the party to make any requisite payments. The only remaining question for the Lexington policy is whether Home was "held liable to pay the full amount" of its limits during its liquidation.

Plaintiff claims that Home was held liable to pay its limits when Home's liquidator recommended a $15 million claim be allowed to Hopeman, which was ordered allowed in January 2014. <u>Id.</u> As other courts have observed, the policy language "has

paid or been held liable to pay" contemplates a scenario in which an underlying insurer is "liable but the insurer for some reason has not paid. The case of insolvency would be such an eventuality." Vickodil v. Lexington Ins. Co., 412 Mass. 132, 137 (Mass. 1992) (internal quotation marks and citation omitted); see also Terminix Int'l Co. P'ship v. Safety Mut. Cas. Co., 974 F.2d 1339 (6th Cir. 1992) (unpublished) (agreeing with the Vickodil court that the phrase "held liable to pay" contemplates, inter alia, the insolvency of the underlying insurer). Thus, an order adjudicating the liability of an insolvent insurer is one of the ways by which an underlying insurer may be "held liable to pay" its policy limits. The Home policy would therefore be exhausted for purposes of the Lexington policy if Hopeman can show that Home was held liable to pay the full limits of the 1971-74 policy (totaling $15 million) during its liquidation.

At oral argument on the instant motions, Plaintiff's counsel submitted documents previously produced in discovery that purportedly show that the $15 million claim was allowed only in reference to the instant Home policy. The first document submitted was titled "Proof of Claim," and it clearly shows that Hopeman only requested a total of $15 million from Home in the liquidation proceedings. Plaintiff's counsel also submitted an internal PowerPoint from the Claro Group titled

"Hopeman Brothers, Inc.: Home Insurance Company Claim Presentation" that was apparently presented in February 2013. Plaintiff's counsel claimed that this document demonstrates that Hopeman had not made any claims on any other Home policy by the time it submitted its proof of claim. Plaintiff's counsel also submitted a chart showing all of Hopeman's commercial general liability insurance policies. The chart demonstrates that Hopeman had seven policies (including the instant policy) from the Home which have combined limits of approximately $98 million. The chart also shows that Hopeman's six other policies all have attachment points above $40 million. Plaintiff's counsel claimed that the $15 million allowed claim reflected the Home liquidator's assumption that the other six policies were in such high coverage tiers that they would never be reached. In light of these documents, Plaintiff asserts that the $15 million allowed claim should be seen as a determination that Home was held liable to pay the $15 million limits of the instant policy.

Even with these supporting documents before it, the Court finds that genuine issues of material fact remain as to whether the allowed claim was made solely with regard to the instant Home policy. As Defendants point out, the claim allowed was made to resolve Hopeman's claims against all seven Home policies. Defs.' Summ. J. Reply Br. at 12; see also Settlement Agreement, Ex. 16 at 3038, ECF No. 87-6 (noting the seven

different policies whose liability was resolved by the agreement). While Hopeman may claim that the other policies were in such high tiers that they likely would never have been reached, Hopeman's documents suggest otherwise. As Defendants' counsel noted at oral argument, the Claro Group claims presentation PowerPoint from February 2013 indicates that Hopeman anticipated hundreds of millions in additional asbestos-related costs by 2047. It thus appears that Hopeman may reasonably have believed that these tiers could eventually have been reached, and therefore the $15 million claim may have been allowed in light of the combined limits of approximately $98 million that Hopeman would have been entitled to under the Home policies. Thus, there is a genuine issue of material fact as to whether Home has been "held liable to pay" the full limits of its 1971-74 policy, and consequently the Court cannot grant summary judgment that the Home policy is exhausted with respect to the Lexington policy.

Therefore, the Court **DENIES** Plaintiff's request for summary judgment that Home has been "held liable to pay" its limits, ECF No. 81, and also **DENIES** summary judgment to Defendants that the Home policy cannot be exhausted with respect to the Lexington policy. ECF No. 83.

### 5. Whether Hopeman May Fill the Gap for the 1971-74 Continental Policy

The Court turns next to address whether Hopeman may fill the gap with respect to the 1971-74 Continental policy. As previously noted, the Continental policy includes no language requiring the "underlying insurer" to make the requisite payments. The policy simply states that Continental will "indemnify the insured for the amount of **loss** which is in excess of the applicable limits of liability of the underlying insurance[,]" where loss is defined as "**the sums paid** as damages . . . for which the insured is legally liable[.]" Ex. A at 12, ECF No. 1-1 (emphasis in original). This policy language is less specific than in any of the above-cited cases. If the Court were only looking to this language, the Maximus court's analysis would be the most applicable and would lead to the conclusion that such language is ambiguous as to whether Hopeman can fill the gap. However, the 1971-74 Continental policy incorporates a provision from the Home policy that clarifies the Continental policy's initial ambiguity.

Defendants have explicitly admitted that the Continental policy incorporates the Home policy's Loss Payable provision. Ex. 2 at 7, ECF No. 83-2. The Loss Payable provision states that liability will not attach until "the Insured, or the Insured's underlying insurer, shall have paid the amount of the

96

underlying limits." Home Policy, Ex. E at 66, ECF No. 1-5.  The disjunctive use of "or" in this provision plainly contemplates payment by either the insured or the underlying insurer to exhaust the policy's limits.  The Continental policy, which has no language regarding which party is required to make payment, also does not conflict with the Loss Payable provision.  The presence of this incorporated Loss Payable provision thus unambiguously demonstrates that the 1971-74 Continental policy may be exhausted through payment by Hopeman up to the underlying limit.

Although neither party specifically addressed the import of the Home policy's Loss Payable provision in their briefs, the Court addressed this issue with the parties at oral argument on the instant motions.  At oral argument, the Court asked the parties about whether this provision would alter the Continental policy's ambiguity as to whether Hopeman could fill the gap. Plaintiff's counsel replied enthusiastically, claiming it bolstered Hopeman's argument that it could fill the gap. Counsel for Defendants did not explicitly concede that this provision alters the Continental policy, but argued that, even if it did, there is no evidence that Hopeman has made payments that exhaust the Home policy.  Defense counsel did not, however, present any reasons for why the Loss Payable provision would not permit Hopeman to fill the gap. In the absence of any compelling

reason to find that the Loss Payable provision otherwise conflicts with the 1971-74 Continental policy, the Court finds that it is incorporated and governs the issue of whether Hopeman may fill the gap.

Numerous other courts interpreting identical or similar provisions to the above Loss Payable provision have held that they establish that exhaustion may be satisfied either by the insured or the underlying insurer. See, e.g., Am. Guarantee & Liab. Ins. Co. v. Norfolk S. Ry. Co., 278 F. Supp. 3d 1025, 1054 (E.D. Tenn. 2017) (noting that either the insured or the underlying insurer's obligations could satisfy a provision stating that liability would not attach "until the Insured, or the Insured's underlying insurer has paid or is legally obligated to pay the full amount of the Underlying Limits."); Scott's Liquid Gold-Inc. v. Lexington Ins. Co., 97 F. Supp. 2d 1226, 1236 (D. Colo. 2000), aff'd in part, rev'd in part sub nom. Scott's Liquid Gold, Inc. v. Lexington Ins. Co., 293 F.3d 1180 (10th Cir. 2002) (reversed on other grounds) (interpreting an identical Loss Payable provision to the Home policy and finding that payment by the insured exhausted the policy); Radiator Specialty Co. v. First State Ins. Co., 651 F. Supp. 439, 442 (W.D.N.C.), aff'd, 836 F.2d 193 (4th Cir. 1987) (finding a provision that stated that coverage would not apply unless "the INSURED, or the INSURED's underlying insurer, shall

be obligated to pay the amount of the UNDERLYING LIMIT" meant that the Insured's obligations could exhaust the policy); N. Am. Van Lines, Inc. v. Lexington Ins. Co., 678 So. 2d 1325, 1330 (Fla. Dist. Ct. App. 1996) (interpreting an identical Loss Payable provision to the Home policy and finding that "Lexington would be liable under the policy once the insured or its primary insurer paid the underlying limits"); N. Carolina Ins. Guar. Ass'n v. Century Indem. Co., 115 N.C. App. 175, 185 (N.C. Ct. App. 1994) (finding that a similar Loss Payable condition could be "exhausted by payment, coming either from the insured or from the insured's underlying carrier."); Span, Inc. v. Associated Internat. Ins. Co., 227 Cal. App. 3d 463, 476 (Cal. Ct. App. 1991) (interpreting an identical Loss Payable provision to the Home policy and finding that "the Associated policy unambiguously contemplates "exhaustion" of the underlying insurance only by *payment* of the underlying limits either by the insured or its primary carrier."); Morbark Indus., Inc. v. W. Employers Ins. Co., 170 Mich. App. 603, 612-13, 429 N.W.2d 213, 218 (1988) (finding disjunctive "or" in a condition stating that liability attached after "the INSURED, or the INSURED'S underlying insurer, shall be obligated to pay the amount of the underlying limit" meant that the resulting obligations could be for "either the insured or the underlying carrier to pay the [underlying limits].").

Therefore, because the 1971-74 Continental policy's own provisions are silent about whether Hopeman can fill the gap, and because the policy incorporates the Loss Payable provision of the underlying Home policy, the Court finds that the 1971-74 Continental policy is unambiguous and that summary judgment on this issue is warranted. Seiden Assocs., 959 F.2d at 428. Thus, the Court **GRANTS** summary judgment to Hopeman on this issue, finding that Hopeman may fill the gap created by the Home's insolvency with respect to the 1971-74 Continental policy, ECF No. 81, and **DENIES** summary judgment to Defendants on the same issue. ECF No. 83.

### G. Whether Hopeman Has Satisfied Any Duty to Mitigate

Plaintiff next seeks summary judgment that it has satisfied any duty to mitigate or avoid losses in connection with asbestos-related claims. Pl.'s Partial Summ. J. Br. at 29. Defendants' main allegation is that Hopeman failed to mitigate asbestos-related damages because it continued to sell asbestos-containing inventory pursuant to pre-existing contracts, but Defendants also raise arguments about Hopeman's potential claims against Ingalls Shipyard and about whether Hopeman should have done more to protect its workers from asbestos exposure. Defs.' Opp'n Partial Summ. J. Br. at 30. In response, Plaintiff argues that it took "conservatively extreme measures to limit asbestos-related exposures." Pl.'s Partial Summ. J. Br. at 29. Hopeman

claims that summary judgment is appropriate because the insurers will be unable to rebut this evidence of mitigation.   Id.

Under New York and Virginia law, the issue of mitigation is normally a question for the jury.[9] The Supreme Court of Virginia has observed that the issue of whether a party "acted reasonably to minimize his damage is a question for the jury." Sawyer v. Comerci, 264 Va. 68, 77 (Va. 2002).  New York law on this issue is the same. See Patton v. Egan, No.   12 CIV. 2500 LGS, 2014 WL 4652489, at *11 (S.D.N.Y. Sept. 18, 2014) ("Mitigation, however, is a question of fact for the jury and not a basis for summary judgment.") (citing Tynan Incinerator Co. v. Int'l Fid. Ins. Co., 117 A.D.2d 796, 797 (N.Y. App. Div. 1986)).

The Court is not persuaded that Hopeman's evidence renders the issue of mitigation one on which no reasonable juror could find that Plaintiff failed to mitigate its damages, and accordingly the Court finds that the issue of mitigation is a fact question that should be resolved by the jury.   The Court therefore **DENIES** Plaintiff's request for summary judgment on the issue of mitigation of damages.   ECF No. 81.

---

[9] The parties have not stated where the alleged tortious acts took place, but they cite to cases from New York and Virginia.   See Defs.' Opp'n Partial Summ. J. Br. 30, ECF No. 98 (citing Aman v. Federal Exp. Corp., 701 N.Y.S.2d 571 (N.Y. App. Div 1999); Sawyer v. Comerci, 264 Va. 68, 77 (Va. 2002)); Pl.'s Partial Summ. J. Reply Br. 16-17, ECF No. 115 (citing LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp, 899 N.Y.S.2d 15, 17 (N.Y. App. Div. 2010)).   The Court thus assumes for purposes of this motion that only the substantive law of New York and Virginia apply to the issue of mitigation.

## VI. CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment, ECF No. 83, is **GRANTED** in part **and DENIED** in part, and Plaintiff's Partial Motion for Summary Judgment, ECF No. 81, is **GRANTED** in part **and DENIED** in part.

The Court **DENIES** Defendants' request for summary judgment that a pro rata allocation method applies to the policies, ECF No. 83, and **GRANTS** Plaintiff's request for summary judgment that all sums allocation applies to the policies, ECF No. 81.

The Court **GRANTS** summary judgment in favor of Plaintiff on the issue of vertical exhaustion, finding that vertical exhaustion applies to the policies at issue and that Hopeman may obtain coverage from the Insurers up to a combined $7 million in each policy year where any directly underlying $500,000 primary policy limit and $10 million underlying excess limit has been satisfied. ECF No. 81.

The Court **GRANTS** Hopeman's request for summary judgment that the "prior insurance" or "non-cumulation" clauses only reduce the Insurers' policy limits to the extent that Hopeman has recovered for that same "occurrence" or "loss" under relevant prior insurance at the same "layer" or horizontal "tier" of coverage. ECF No. 81. The Court also **GRANTS** summary judgment to Hopeman that the first $7 million of Hopeman's damages claim cannot be subject to an NCC defense. ECF No. 81.

The Court **GRANTS** summary judgment to Hopeman regarding the 1974-77 Continental Policy's non-cumulation clause, finding that it limits its application to recoveries involving the same "occurrence," and that each individual alleging bodily injury from exposure to Hopeman asbestos-containing material presents a separate "occurrence." ECF No. 81.

The Court **GRANTS** summary judgment to Defendants on the issue of whether the term "loss" in the relevant non-cumulation clauses refers to the gross amount Hopeman is seeking under each policy, ECF No. 83, and **DENIES** summary judgment to Plaintiff on the same issue. ECF No. 81.

The Court **GRANTS** summary judgment to Defendants on the issue of the defense coverage associated with the 1971-74 Lexington policy, finding that the 1971-74 policy only provides for the reimbursement of defense costs within limits, and also only provides for reimbursement of defense costs paid as a consequence of a covered occurrence. ECF No. 83. The Court **DENIES** Hopeman's request for summary judgment regarding the 1971-74 Lexington policy. ECF No. 81.

The Court **DENIES** summary judgment to Hopeman regarding the scope of defense coverage available under 1974-77 Lexington policy. ECF No. 81. The Court also **DENIES** Defendants' request for summary judgment on this same issue. ECF No. 83.

The Court **DENIES** Hopeman's request for summary judgment

that the trigger for injury-in-fact differs by whether a claim falls into either "products/completed operations" or "operations" coverage. ECF No. 81.

The Court **DENIES** Hopeman's request for summary judgment that, as to one "who ultimately develops lung cancer, mesothelioma, or nonmalignant asbestos-related disease, bodily injury first occurs, for policy purposes, upon cellular and molecular damage caused by asbestos inhalation, and such cellular and molecular damage occurs during each and every period of an asbestos claimant's significant exposure to asbestos and continues thereafter." ECF No. 81. The Court also **DENIES** Plaintiff's request for summary judgment that the "dates of first substantial exposure are acceptable evidence of injury-in-fact trigger." ECF No. 81.

With respect to the issue of whether Hopeman can "fill the gap" by making payments to exhaust the Home policy's limits, the Court **DENIES** Plaintiff's request for summary judgment that Home has been "held liable to pay" its limits, ECF No. 81, and **DENIES** summary judgment to Defendants that the Home policy cannot be exhausted with respect to the Lexington policy. ECF No. 83. On this same issue but with respect to the 1971-74 Continental policy, the Court **GRANTS** summary judgment to Hopeman, finding that it can "fill the gap" by making payments exhausting the underlying limits of the Home policy, ECF No. 81, and **DENIES**

summary judgment to Defendants.   ECF No. 83.

With respect to the issue of Plaintiff's duty to mitigate or avoid losses for asbestos-related claims, the Court **DENIES** Plaintiff's request for summary judgment.   ECF No. 81.

The Clerk is **DIRECTED** to send a copy of this Opinion and Order to all counsel of record.

**IT IS SO ORDERED.**

_____
/s/
Mark S. Davis
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
April 2 , 2018